#27739-rev in part, aff in part-LSW
**2017 S.D. 59**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JOSEPH A. JONES,                              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE GREGORY J. STOLTENBURG
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CAROLINE SRSTKA
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                         and appellee.


D. SONNY WALTER
Sioux Falls, South Dakota               Attorney for defendant
                                         and appellant.

* * * *

ARGUED OCTOBER 4, 2016
OPINION FILED **09/20/17**

#27739

WILBUR, Retired Justice

[¶1.]        Law enforcement installed a pole camera (without a warrant) on a public street light to record defendant's activities outside of his home, beginning the same day the officers received a tip that a known drug dealer had been traveling to defendant's home to obtain drugs.  The camera recorded defendant's activities outside his home for two months, and the officers used the information gained from the camera to obtain a search warrant for defendant's home.  The officers executed the warrant and arrested defendant.  Defendant moved to suppress the evidence, asserting that the officers' use of the pole camera without a warrant violated the Fourth Amendment.  The circuit court denied defendant's motion.  Defendant appeals.  We reverse in part and affirm in part.

## Background

[¶2.]        On January 23, 2015, Elizabeth Carlson, an agent with the South Dakota Division of Criminal Investigation (DCI), informed Detective Dana Rogers of the Brookings Police Department that a person living in the Brookings area may be dealing large quantities of marijuana.  Agent Carlson relayed to Detective Rogers that an informant had told her that a man named Brady Schutt would travel from Huron to Joseph Jones's residence in Brookings to pick up large quantities of marijuana to take back to Huron to sell.  Agent Carlson also informed Detective Rogers that Schutt drives a red GMC pickup.  Detective Rogers confirmed that Schutt drove a red GMC pickup and noted the license plate number.  He also verified Jones's address through a computer search.  Jones lives in a trailer within and near the entrance to the Lamplighter Village Trailer Park.

[¶3.]    The same day he received the tip from Agent Carlson, Detective Rogers arranged for a City employee to install a pole camera on a public street light across from Jones's trailer. Detective Rogers did not obtain a warrant for the camera. The employee installed the pole camera inside a pole camera box approximately two to four feet below the top of the light. The box, but not the camera, was visible to the public. The camera recorded a street, and Jones's residence and front yard. Detective Rogers testified that he could use a zoom feature to get the camera's focus closer to Jones's residence, but the footage would become blurry and distorted, preventing a clear picture. The pole camera did not have night vision but recorded throughout the night. The night recordings would capture vehicles with lights that drove up to the residence or under the street light. The night recordings would also display shadows of people walking, depending on how clear the evening was. The State claimed that the camera did not record inside Jones's residence. But there is no recording to review to determine the accuracy of that information. The State did not retain the recordings.

[¶4.]    From January 23, 2015 to March 19, 2015, the pole camera continuously recorded activity outside of Jones's residence. The camera sent a live feed to a server located in Pierre, South Dakota, at DCI and to a mobile phone accessible by Detective Rogers. Detective Rogers could view the recording live or he could look at previously-recorded footage to view what had already taken place. Detective Rogers could review a day's worth of activity in approximately 10 to 11 minutes by fast forwarding through the footage. He explained that he could fast

forward when nothing happened, and if he observed movement, he could play the recording in real time.

[¶5.] The pole camera documented when Jones's vehicle was at the residence, when it left, how long it was gone, when visitors came and where they parked, how long they stayed, when pedestrians walked by, etc. Detective Rogers noted the instances when Jones was gone for an extended time. Detective Rogers also observed vehicles associated with known drug offenders, including the red GMC, arrive several times at Jones's residence, all hours of the day and night, sometimes for a short time, sometimes longer.

[¶6.] On March 6, Detective Rogers reviewed the footage and observed Jones place a black or dark-colored trash bag into his vehicle and drive a short distance and return. Detective Rogers assumed Jones placed the bag in the community dumpster. Detective Rogers and Agent Scot Hawks drove to the dumpster, opened what appeared to be the bag Jones placed in his vehicle, and identified a package addressed to Jones. Ultimately, Detective Rogers retrieved items from the trash bag indicating the use or possession of marijuana.

[¶7.] On March 11, Detective Rogers again observed Jones load something into his vehicle and drive a short distance and return. Detective Rogers and another officer returned to the dumpster and seized trash bags containing objects linking the trash bags to Jones. In those bags, Detective Rogers also found partial marijuana blunts and two marijuana stems (one stem tested presumptively positive for marijuana).

[¶8.]        On March 11, Detective Rogers used the information learned from the pole camera to prepare an affidavit for a search warrant to install a GPS tracking device on two vehicles at Jones's residence. The circuit court signed the warrant, and Detective Rogers installed the GPS tracking devices. Then on March 13, again using the information obtained from the pole camera, Detective Rogers submitted a second application for a search warrant to search Jones's residence. The circuit court signed the warrant. On March 19, 2015, Detective Rogers and others executed the search warrant and subsequently arrested Jones. The State charged Jones with multiple drug-related offenses.

[¶9.]        Jones moved to suppress the evidence obtained during the search, arguing that the State's use of the pole camera violated the Fourth Amendment. The circuit court held a hearing. During the hearing, the court noted, "as a preliminary matter, . . . the majority of the information presented by Officer Rogers in the affidavits to request GPS monitoring and a search of [Jones's] residence . . . w[as] from information obtained through the use of the pole camera identified in this matter." The court informed counsel "that if the information provided in the search warrant affidavits regarding the pole camera, if that information was removed from the affidavits, that there would not be sufficient probable cause to issue the warrants." The court further indicated that "any evidence obtained as a result of those search warrants would not be used pursuant to the *Wong Sun* fruit of a poisonous tree decision."

[¶10.]        In regard to the merits, the court found significant that the pole camera "did not track the whereabouts of any of the residents other than the fact

that they were either in the mobile home or outside the mobile home." The court found no difference between an officer's ability to conduct a stakeout outside a person's residence and the use of technology in the officer's place. The court further found compelling that cameras "have become a common occurrence" in public places. The court concluded society would not recognize that one has an unfettered expectation of privacy once one steps outside his or her home.

[¶11.] The court issued findings, conclusions, and an order denying Jones's motion to suppress. It held "[t]hat there was no physical invasion of [Jones's] residence or privacy, and the use of physical observation in this case, via a pole camera, was conducted on public property, and without trespassing onto [Jones's] property, and thus, no Fourth Amendment violation has occurred." The court further concluded that even if use of the pole camera had violated the Fourth Amendment, the good-faith exception to the exclusionary rule applied. Jones appeals, arguing that the circuit court erred when it denied his motion to suppress.

## Standard of Review

[¶12.] We review a denial of a motion to suppress de novo. *State v. Thunder*, 2010 S.D. 3, ¶ 11, 777 N.W.2d 373, 377. The court's findings of fact will not be overturned unless clearly erroneous. *Id.* The application of the law to those facts, or the "court's legal rationale," however, is a question of law reviewed de novo. *Id.*

## Analysis

[¶13.] Jones likens this case to this Court's decision in *State v. Zahn*, 2012 S.D. 19, 812 N.W.2d 490. In *Zahn*, we found unconstitutional law enforcement's warrantless use of a GPS tracking device attached to Zahn's vehicle. *Id.* ¶ 31.

Jones concedes that the use of a GPS tracking device involved a physical trespass unlike law enforcement's use of a pole camera on the city's street light in this case. But in Jones's view, law enforcement's installation of a pole camera specifically targeted at his residence for the sole purpose of continuously surveilling the activity just outside of his residence twenty-four hours a day for two months is equally if not more intrusive than the GPS tracking device used in *Zahn*. He emphasizes that the Fourth Amendment provides greater protection for homes and persons as compared to effects like a vehicle.

[¶14.]     The Fourth Amendment gives people the right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, and shall not be violated. U.S. Const. amend. IV; S.D. Const. art. VI, § 11. Historically, "Fourth Amendment jurisprudence was tied to common-law trespass"—a search occurs when the government physically intrudes upon a person's property. *United States v. Jones*, 565 U.S. 400, 405, 132 S. Ct. 945, 949, 181 L. Ed. 2d 911 (2012). Here, law enforcement's use of a pole camera on a public street was not a physical trespass into a protected area. But the United States Supreme Court's later cases "deviated from that exclusively property-based approach." *Id.* at 405-06, 132 S. Ct. at 950 (citing *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576 (1967)). In *Katz*, the Court held that "the Fourth Amendment protects people, not places." 389 U.S. at 351, 88 S. Ct. at 511. Cases following *Katz* applied the test stated by Justice Harlan in his concurrence—a search in violation of the Fourth Amendment also occurs when law enforcement violates a person's "reasonable expectation of privacy." *Jones*, 565 U.S.

at 406, 132 S. Ct. at 950 (quoting *Katz*, 389 U.S. at 360, 88 S. Ct. at 516 (Harlan, J., concurring)). The reasonable expectation of privacy test "has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* at 408, 132 S. Ct. at 951 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 472, 142 L. Ed. 2d 373 (1998)). This two-part test asks (1) "whether an individual exhibited an actual expectation of privacy in the area searched" and (2) "whether society is prepared to recognize that expectation of privacy as reasonable." *Zahn,* 2012 S.D. 19, ¶ 20, 812 N.W.2d at 496 (quoting *Thunder*, 2010 S.D. 3, ¶ 16, 777 N.W.2d at 378). We determine whether a person has a legitimate expectation of privacy on a "case-by-case basis, considering the facts of each particular situation." *Thunder*, 2010 S.D. 3, ¶ 16, 777 N.W.2d at 379 (quoting *State v. Hess*, 2004 S.D. 60, ¶ 17, 680 N.W.2d 314, 322).

[¶15.]     Before we determine whether Jones had a reasonable expectation of privacy that society would recognize as reasonable, we address the fact that the pole camera recorded Jones's activities in an area exposed to the public. Long ago, the United States Supreme Court said, "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351, 88 S. Ct. at 511. "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812, 90 L. Ed. 2d 210 (1986). Likewise, the United States Supreme Court has said—in examining the use of a beeper signal—that

"[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *United States v. Knotts*, 460 U.S. 276, 282, 103 S. Ct. 1081, 1086, 75 L. Ed. 2d 55 (1983).

[¶16.]     In line with *Katz* and *Ciraolo*, this Court upheld an officer's use of a zoom-lens camera to take photographs of marijuana observed by the officer's naked eye while flying over defendant's residence. *State v. Vogel*, 428 N.W.2d 272, 276 (S.D. 1988). Other courts also have held that visual observation of areas exposed to the public does not constitute a search, i.e., the cases cited by the dissent dating before 2012. *See, e.g.*, *United States v. Bucci*, 582 F.3d 108 (1st Cir. 2009); *United States v. Vankesteren*, 553 F.3d 286 (4th Cir. 2009); *United States v. Gonzalez*, 328 F.3d 543 (9th Cir. 2003); *United States v. Jackson*, 213 F.3d 1269 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033, 121 S. Ct. 621, 148 L. Ed. 2d 531 (2000); *United States v. Aguilera*, No. 06-CR-336, 2008 WL 375210 (E.D. Wis. Feb. 11, 2008) (the "substitution of a camera for in-person surveillance does not offend the Fourth Amendment"); *United States v. Clarke*, No. Crim.3:04 CR SRU, 2005 WL 2645003 (D. Conn. July 19, 2005); *United States v. West*, 312 F. Supp. 2d 605 (D. Del. 2004); *Rodriguez v. United States*, 878 F. Supp. 20 (S.D.N.Y. 1995).

[¶17.]     But in 2012, the United States Supreme Court decided *Jones*, 565 U.S. 400, 132 S. Ct. 945. *Jones* examined the warrantless use of a GPS tracking device on an automobile and ultimately concluded that a trespassory search occurred requiring a warrant under the Fourth Amendment. *Jones* is relevant in this case because both the majority and concurring decisions in *Jones* brought into question

the legality of warrantless, long-term video surveillance of an individual's activities or home.

[¶18.]     Justice Scalia, authoring the Opinion of the Court, noted that although "our cases *suggest* that such visual observation is constitutionally permissible[, i]t may be that achieving the same result [(targeted, long-term surveillance)] through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy[.]" *Jones*, 565 U.S. at 412, 132 S. Ct. at 953-54 (emphasis added) (The majority declined to address this question.).  Likewise, Justice Alito, concurring in the judgment and joined by Justices Ginsburg, Breyer, and Kagan, recognized that advancement in technology changes privacy expectations.  Thus, although "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable," *id.* at 430, 132 S. Ct. at 964 (Alito, J., concurring in the judgment), "existing Fourth Amendment doctrine" must consider 21st-century surveillance techniques to determine "whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." *Id.* at 419, 430, 132 S. Ct. at 958, 964.

[¶19.]     Justice Sotomayor wrote a separate concurring opinion noting the privacy concerns evident in "the Government's unrestrained power to assemble data that reveal private aspects of identity[.]" *Id.* at 416, 132 S. Ct. at 956 (Sotomayor, J., concurring).  "Awareness that the Government may be watching chills associational and expressive freedoms." *Id.*  Justice Sotomayor also endorsed Justice Alito's sentiments: "As Justice Alito incisively observes, the same

technological advances that have made possible nontrespassory surveillance techniques will also affect the *Katz* test by shaping the evolution of societal privacy expectations." *Id.* at 415, 132 S. Ct. at 955.

[¶20.] Following *Jones*, several courts have examined whether long-term video surveillance constitutes a search. The circumstances of the cases vary but can be categorized as cases involving video surveillance of the activities: (1) outside a business, (2) outside a home other than the defendant's, (3) in a public place not including the defendant's home, and (4) outside the defendant's home. In those cases involving video surveillance of the activities outside the defendant's home, some courts have declined to consider either the aggregate nature of the surveillance or the fact that the public does not get exposed to the aggregate of another's comings and goings. Instead, these decisions rely on the reasoning in *Katz*, *Knotts*, and *Ciraolo*, to conclude that what one exposes to the public is not protected and that law enforcement can augment their sensory faculties with technology. *See, e.g.*, *United States v. Houston*, 813 F.3d 282, 288 (6th Cir. 2016) ("The ATF agents only observed what Houston made public to any person traveling on the roads surrounding the farm. Additionally, the length of the surveillance did not render the use of the pole camera unconstitutional, because the Fourth Amendment does not punish law enforcement for using technology to more efficiently conduct their investigations."); *United States v. Anderson-Bagshaw*, 509 Fed. Appx. 396 (6th Cir. 2012); *United States v. Brooks*, 911 F. Supp. 2d 836, 843 (D. Ariz. 2012) ("[L]aw enforcement's use of the pole camera affixed to the arena was 'a prudent and efficient use of modern technology' to enhance their sense of sight and

allowed for law enforcement to see 'what may be seen' from a public vantage point where they had a right to be."); *accord United States v. Campuzano-Chavez*, No. CR-15-00154-HE, 2016 WL 879326 (W.D. Okla. March 7, 2016); *United States v. Gilliam*, Nos. 02:12-CR-93, 02:13-CR-235, 2015 WL 5178197 (W.D. Penn. Sept. 4, 2015); *Martinez-Turcio v. United States*, No. 6:10-CR-00054-GRA-1, 2013 WL 12106924 (D.S.C. Oct. 18, 2013); *United States v. Baltes*, 8:11-CR-282 (MAD), 2013 WL 11319002 (N.D.N.Y. April 22, 2013); *United States v. Nowka*, No. 5:11-CR-474-VEH-HGD, 2012 WL 6610879 (N.D. Ala. Dec. 17, 2012).

[¶21.]     In the other categories of cases, courts concluded that no search occurred based on controlling precedent in the respective circuit or because the area surveilled was not a home or the defendant's home. *State v. Duvernay*, ___ N.E.3d ___, No. 1-16-62, 2017 WL 2537559 (Ohio Ct. App. June 12, 2017) (applying precedent); *United States v. Pratt*, 16-CR-20677-06, 2017 WL 2403570 (E.D. Mich. June, 2, 2017) (video surveillance of an uninhabited building not owned by defendant); *United States v. Bailey*, 15-CR-6082G, 2016 WL 6995067 (W.D.N.Y. Nov. 29, 2016) (video surveillance of area surrounding home not owned by defendant—he was a guest); *United States v. Garcia-Gonzalez*, No. 14-10296-LTS, 2015 WL 5145537 (D. Mass. Sept. 1, 2015) (bound by first circuit precedent); *United States v. Wymer*, 40 F. Supp. 3d 933 (N.D. Ohio 2014) (surveillance of defendant's business); *United States v. Root*, No. 2:14-CR-0001-TOR-2, 2014 WL 4715874 (E.D. Wash. Sept. 22, 2014) (camera did not record front or back door of the house; the views did not even come close to the house); *United States v. Moore*, No. 14-20206-CR, 2014 WL 4639419 (S.D. Fla. Sept. 16, 2014) (video surveillance did not capture

home; it captured activities on a commercial property). And one decision concluded that the use of lengthy, sustained video surveillance of a person's home constituted a search. *United States v. Vargas*, No. CR-13-6025-EFS (E.D. Wash. Dec. 15, 2014).

[¶22.] Nevertheless, the above decisions by federal courts of appeal and other lower courts do not bind this Court's examination of the question whether Jones had a reasonable expectation of privacy that society would recognize as reasonable. *See State v. Greger*, 1997 S.D. 14, ¶ 6 n.5, 559 N.W.2d 854, 859 n.5 (quoting *Asarco, Inc. v. Kadish*, 490 U.S. 605, 617, 109 S.Ct. 2037, 2045, 104 L.Ed.2d 696 (1989) ("state courts . . . possess the authority, absent a provision for exclusive federal jurisdiction, to render binding judicial decisions that rest on their own interpretations of federal law")). And we do not find dispositive that the United States Supreme Court has held years ago—in regard to observation via other sense-enhancing means—that a search did not occur. *See* Dissent, *infra* ¶ 58.

[¶23.] Indeed, what privacy expectations were reasonable in 1986 when *Ciraolo* was decided, in 1983 when *Knotts* was decided, or in 1967 when *Katz* was decided do not alone dictate what expectations are reasonable today. "It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *Kyllo v. United States*, 533 U.S. 27, 33-34, 121 S. Ct. 2038, 2043, 150 L. Ed. 2d 94 (2001). If there comes a time when "'twenty-four hour surveillance of any citizen of this country will be possible, without judicial knowledge or supervision' . . . there will be time enough then to determine whether different constitutional principles may be

applicable." *Knotts*, 460 U.S. at 283-84, 103 S. Ct. 1086 (Quoting the respondent's brief.).

[¶24.] Even so, the dissent further argues that "this Court should not follow Justice Alito's concurring opinion." *Infra* ¶ 59. It quotes a sentence from *Kyllo* that the "Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained." 533 U.S. at 37, 121 S. Ct. at 2045. Notably, the sentences in *Kyllo* following the one quoted by the dissent reveal that the Supreme Court was referring to the premise that the home— the physical home—"is held safe from prying government eyes." *See id.* Thus, when police conduct trespasses the home, the quantity or quality of information obtained does not dictate whether a trespassory search occurred.

[¶25.] But this case does not concern a physical trespass; therefore, the *Katz* analysis controls. Indeed, the majority in *Jones* recognized that "resort must be had to *Katz* analysis" when the Court "may have to grapple with" the question whether achieving visual observation through electronic means constitutes a search under the Fourth Amendment "in some future case where a classic trespassory search is not involved[.]" 565 U.S. at 412-13, 132 S. Ct. at 954. We note that the *Katz* analysis comes directly from a concurring writing in *Katz*. We further note that in *Jones* three justices joined Justice Alito's writing, and Justice Sotomayor endorsed the view that examining the existence of a reasonable expectation of privacy includes considering the method of surveillance, what the method has the potential to produce, and how the method implicates the evolution of privacy expectations under *Katz*. *Id.* at 414-16, 132 S. Ct. at 955-56 (Sotomayor, J., concurring).

[¶26.]     Because today's case requires this Court to "grapple with these 'vexing problems'" not answered in *Jones* or any other United States Supreme Court case, we apply the two-part *Katz* test to the circumstances of this case. *See id.* at 412, 132 S. Ct. at 945 (majority opinion). We examine whether Jones had a subjective expectation of privacy that society would recognize as reasonable.

### 1. Subjective Expectation of Privacy

[¶27.]     The State claims Jones did not have a subjective expectation of privacy because Jones's activities were "vividly and continuously exposed to the public." In the State's view, the pole camera merely captured what any person standing on the street could observe with a naked eye. The State also contends that Jones did not expect his actions to be private because he took no effort to obstruct the public's view of his activities. The dissent agrees, asserting that Jones did "not even claim—let alone prove—that [he] subjectively believed his activities in front of his home were concealed from public observation." *Infra* ¶ 54.

[¶28.]     Yes, Jones did not claim that he had an expectation of privacy in each individual activity outside his home. Nor did he assert that he attempted to conceal the front of his home from public observation. But he likens his subjective expectation of privacy to that argued by the defendant in *Zahn*. Jones claims that he had a subjective expectation of privacy in the whole of his movements. In particular, he asserted that he expected to be free from 24/7 targeted, long-term observation of his comings and goings from his home, his guests' comings and goings, the types of cars coming and going from his home, etc.

[¶29.] To adopt the dissent's view would require us to ignore the method of surveillance used in this case and look only to whether Jones attempted to conceal every activity outside his home. Such a constricted analysis would ignore that traditional law enforcement surveillance techniques cannot accumulate the vast array of information that targeted, long-term video surveillance can capture. The information gathered through the use of targeted, long-term video surveillance will necessarily include a mosaic of intimate details of the person's private life and associations. At a minimum, it could reveal who enters and exits the home, the time of their arrival and departure, the license plates of their cars, the activities of the occupant's children and friends entering the home, information gleaned from items brought into the home revealing where the occupant shops, how garbage is removed, what service providers are contracted, etc.

[¶30.] Notably, the United States Supreme Court in *Ciraolo* identified "future electronic developments and" and noted "the potential for electronic interference with private communications[.]" 476 U.S. at 214, 106 S. Ct. at 1813. We too recognized "that privacy interests must be protected" and that "there is a limit to permissible surveillances and searches." *Vogel*, 428 N.W.2d at 275, 277 (noting that the case did not involve "sophisticated gadgetry" or "special equipment not generally in use"). More recently, albeit in dicta, we said in *Zahn* that "[w]hile a reasonable person understands that his movements on a single journey are conveyed to the public, he expects that those individual movements will remain 'disconnected and anonymous.'" 2012 S.D. 19, ¶ 22, 812 N.W.2d at 497 (quoting *United States v. Maynard*, 615 F.3d 544, 563 (D.C. Cir. 2010)).

[¶31.]    We conclude that Jones had a subjective expectation of privacy based on the amassed nature of Detective Rogers's surveillance of Jones's activity. Indeed, the expectation of privacy changes when officers are able to "capture[ ] something not actually exposed to public view—the aggregate of all of [the defendant's] coming and going from the home, all of his visitors, all of his cars, all of their cars, and all of the types of packages or bags he carried and when." *Garcia-Gonzalez*, 2015 WL 5145537, at \*5; *see also Jones*, 565 U.S. at 408, 132 S. Ct. at 951 (citing *Carter*, 525 U.S. at 88, 119 S. Ct. at 473).

## 2. Reasonable Expectation of Privacy

[¶32.]    We next consider whether Jones's subjective expectation of privacy was reasonable. "After all, his personal desire for privacy alone, no matter how earnestly held, does not trigger the protections of the Fourth Amendment." *Zahn*, 2012 S.D. 19, ¶ 23, 812 N.W.2d at 497. The State emphasizes that Detective Rogers could have observed Jones's movements in the same fashion that the camera captured his movements had the detective or another officer parked a vehicle along the public street. The State also claims that society would not recognize that Jones had an "unfettered expectation of privacy" for his actions outside of his residence.

[¶33.]    But Jones is not asserting an *unfettered* right to expect privacy in his movements in public. He is claiming that society would not give law enforcement an *unfettered* right to use targeted, long-term video surveillance without any regard for or protection of a citizen's right to privacy. This type of surveillance is different than law enforcement's warrantless use of pole cameras during Hot Harley Nights in downtown Sioux Falls or during the Sturgis Motorcycle Rally. In Jones's view,

judicial oversight by requiring officers to obtain a warrant ensures that officers do not violate a citizen's Fourth Amendment right to privacy when using a pole camera to observe activity outside a citizen's residence.

[¶34.] We agree. The government action in this case is markedly different than the government actions in *Katz*, *Ciraolo*, and *Knotts*. Four United States Supreme Court justices recognized as much in comparing the use of a GPS tracking device and 18th-century situations: "it is almost impossible to think of late-18th-century situations that are analogous to what took place in this case." *Jones*, 565 U.S. at 420, 132 S. Ct. at 958 (Alito, J., concurring). Again, the United States Supreme Court left open the question whether long-term surveillance is an unconstitutional invasion of privacy. *Id.* at 412, 132 S. Ct. at 954 (majority opinion). *See, e.g., Brooks*, 911 F. Supp. 2d at 842 (recognizing that *Jones* left open for "some future case" the question whether the Supreme Court "is willing to accept the principle that Government surveillance can implicate an individual's reasonable expectation of privacy over time"); *Garcia-Gonzalez*, 2015 WL 5145537, at *3 (recognizing that legality of longer-term video surveillance of an individual's home or activities has not been decided). And *Houston*, *Bucci*, and *Jackson*, although not binding, did not distinguish society's expectation of privacy in *disconnected* and *anonymous* movements knowingly exposed to the public from society's expectation of privacy in the whole of one's movements exposed to the public. The decisions also did not examine how "technology can change those [privacy] expectations." *Jones*, 565 U.S. at 427, 132 S. Ct. at 962 (Alito, J., concurring). Even so, *Bucci* and *Jackson* were decided before *Jones*.

#27739

[¶35.]     The indiscriminate nature in which law enforcement can intrude upon citizens with warrantless, long-term, and sustained video surveillance raises substantial privacy concerns, concerns not present in *Knotts*, *Ciraolo*, and *Vogel*. *See Garcia-Gonzalez*, 2015 WL 5145537, at \*8 (listing and discussing cases from courts that have found "Fourth Amendment problems with extended pole camera surveillance"); *Vargas*, No. CR-13-6025-EFS (order granting a defendant's motion to suppress evidence obtained from the warrantless use of a pole camera to observe and record the defendant's home for six weeks). The dissent, however, compares the pole camera used in this case to "video cameras [that] have been in general public use for years, if not decades."[1] *Infra* ¶ 60. The dissent also asserts that "law enforcement did not utilize sense-enhancing technology[.]"

[¶36.]     On the contrary, the pole camera is not a mere video camera and most certainly allowed law enforcement to enhance their senses. The pole camera captured Jones's activities outside his home twenty-four hours a day, sent the recording to a distant location, and allowed the officer to view it at any time and to replay moments in time. A mere video camera does not accomplish this. More importantly, this type of surveillance does not grow weary, or blink, or have family, friends, or other duties to draw its attention. Much like the tracking of public movements through GPS monitoring, long-term video surveillance of the home will

---

1.     *Kyllo* states that exploration of a home conducted with a device not in use by the general public is a presumptively unreasonable search. 533 U.S. at 40, 121 S. Ct. at 2046. However, this does not necessarily mean the converse is true. The Court in *Kyllo* did not say that exploration of a home with a device in use by the general public is always presumptively reasonable or that such an exploration is never a search.

generate "a wealth of detail about [the home occupant's] familial, political, professional, religious, and sexual associations." *See Jones*, 565 U.S. at 415, 132 S. Ct. at 955 (Sotomayor, J., concurring). The recordings could be stored indefinitely and used at will by the State to prosecute a criminal case or investigate an occupant or a visitor.

[¶37.]     As we recognized in *Zahn*, "unfettered use of surveillance technology could fundamentally alter the relationship between our government and its citizens[.]" 2012 S.D. 19, ¶ 31, 812 N.W.2d at 499. It raises the specter of an Orwellian state and unlocks the gate to a true surveillance society. Indeed, the pole camera targeted at Jones's trailer allowed Detective Rogers to examine at his will and from any location when Jones left his house, how long he was gone, when a guest or multiple guests arrived (and the license plates), when the guests left, when he purchased items or food, when he took out his garbage, etc. These observations revealed the patterns of Jones's life and were gathered without a neutral judicial official deciding whether law enforcement had probable cause to justify the intrusion.

[¶38.]     This does not mean that "the advance of technology would one-sidedly give criminals the upper hand." *Houston*, 813 F.3d at 290. "We recognize that police must be allowed to use developing technology in the 'often competitive enterprise of ferreting out crime.'" *Zahn*, 2012 S.D. 19, ¶ 32, 812 N.W.2d at 500 (quoting *State v. Sweedland*, 2006 S.D. 77, ¶ 22, 721 N.W.2d 409, 415). But when citizens have a reasonable expectation of privacy, law enforcement must first obtain a warrant. *Id.*; *United States v. Falls*, 34 F.3d 674, 679 (8th Cir. 1994) ("[S]ilent

video surveillance, conducted consistent with the Fourth Amendment, is authorized[.]"). To conclude otherwise means that law enforcement would be free to place a video camera at any public location and film the activity outside any residence, for any reason, for any length of time, all while monitoring the residence from a remote location by computer or phone.

[¶39.] In response, the dissent insists that "the best solution to such concerns is legislative—not judicial." *Infra* ¶ 62. It claims this opinion holds that the United States Constitution prohibits "a two-month surveillance of the front of a residence from a public vantage point." *Infra* ¶ 62 n.11; *accord infra* ¶ 52. Thus, according to the dissent, "[i]f the controlling law is to change, such change should come either from the United States Supreme Court or the South Dakota Legislature." *Infra* ¶ 63.

[¶40.] On the contrary, this case concerns long-term, remote surveillance, and there is no controlling law on that question. More importantly, the question whether a search occurred *in this case* in violation of the Fourth Amendment is judicial—not legislative. The South Dakota Legislature has not yet enacted legislation governing law enforcement's use of pole cameras for surveillance; therefore, this case implicates the *Katz* test. *See Jones*, 565 U.S. at 412-13, 132 S. Ct. at 954 (explaining that the *Katz* test will be necessary to "grapple with" the question).

[¶41.] Even so, today's case does not prevent the Legislature from "regulating law enforcement's use of long-term surveillance." *Infra* ¶ 62. For example, in response to decisions by the United States Supreme Court interpreting the Fourth

Amendment, Congress has enacted comprehensive legislation. *See Jones*, 565 U.S. at 427-28, 132 S. Ct. at 963 (Alito, J., concurring) (discussing an example); *Smith v. Maryland*, 442 U.S. 735, 99 S. Ct. 257, 761 L. Ed. 2d 220 (1979) (prompting the enactment of the Foreign Intelligence Surveillance Act in 1978). We also note that today's decision does not declare a rigid rule against law enforcement's use of long-term, remote surveillance. *Infra* ¶ 62 n.11. Nor does today's case prevent the Legislature from regulating long-term surveillance, including surveillance for longer than two months.

[¶42.] Instead, we decide today's case on the circumstances presented—the warrantless use of a pole camera to surveil a suspect's activities outside his residence for two months, which camera law enforcement installed moments after receiving a tip regarding alleged criminal activity. As Justice Alito recognized, when the State has not enacted legislation, "[t]he best that we can do in this case is to apply existing Fourth Amendment doctrine and to ask whether the use of [the unregulated technology] in a particular case involved a degree of intrusion that a reasonable person would not have anticipated." *Jones*, 565 U.S. at 430, 132 S. Ct. at 964 (Alito, J., concurring).

[¶43.] We conclude that Detective Rogers's warrantless use of a pole camera, specifically installed to chronicle and observe Jones's activities outside his residence from January 23 to March 19, constituted a search under the Fourth Amendment— "its use violates an expectation of privacy that society is prepared to recognize as reasonable." *See Zahn*, 2012 S.D. 19, ¶ 28, 812 N.W.2d at 498. Because Detective Rogers's use of the pole camera constituted a search, Detective Rogers was required

to first obtain a warrant. The circuit court's legal conclusion to the contrary is reversed.

### 3. Good Faith Exception to the Exclusionary Rule

[¶44.]    "[A] warrantless search and seizure is *per se* unreasonable unless it falls within one of the jealously and carefully drawn, strictly circumscribed exceptions to the warrant requirement." *Sweedland*, 2006 S.D. 77, ¶ 14, 721 N.W.2d at 413 (quoting *State v. Luxem*, 324 N.W.2d 273, 279 (S.D. 1982)). The State bears the burden of proving an exception. *Id.* Here, the State does not argue that an exception to the warrant requirement applies.[2] Rather, it asks this Court to deny suppression based on the good faith exception to exclusionary rule.

[¶45.]    The Fourth Amendment does not mandate exclusion when officers conduct an illegal search. *State v. Sorensen*, 2004 S.D. 108, ¶ 8, 688 N.W.2d 193, 196. This is because "[e]xclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236, 131 S. Ct. 2419, 2426, 180 L. Ed. 2d 285 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976)). The exclusionary rule is "a judicially created remedy to deter constitutional violations by government officials." *Sorensen*, 2004 S.D. 108, ¶ 8, 688 N.W.2d at 196.

---

2.    The State also argues that affidavits filed in support of the search warrants remain sufficient after removing the information gained via the pole cameras. At the suppression hearing, the circuit court said that it would find the affidavits insufficient if the evidence from the pole camera was removed from the affidavits. The State did not file a notice of review challenging the court's decision on this. That waives the issue before this Court.

[¶46.] Jones claims it would be unjust to apply the rule here. He argues that that the State did not rely on or mention the good faith exception to the exclusionary rule at the suppression hearing, and the court did not examine the exclusionary rule or good faith exception in its oral ruling. Jones is correct. The good faith exception first appeared in the State's proposed findings of fact and conclusions of law. Jones concedes he did not specifically object to the State's proposed application of the good faith exception. Instead, he asks this Court to enforce the circuit court's oral statement at the hearing that the evidence obtained would be suppressed if the search violated the Fourth Amendment. This we decline to do. The question whether to apply the good faith exception to the exclusionary rule was before the circuit court in the State's proposed findings and conclusions, and the court adopted the State's request to apply the exception. Jones directs us to no law that precludes the circuit court from applying the rule simply because the parties did not discuss it at the suppression hearing.

[¶47.] "We examine the good faith exception de novo." *Id.* ¶ 9, 688 N.W.2d at 197. In *United States v. Leon*, the United States Supreme Court noted that

> [t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.

468 U.S. 897, 919, 104 S. Ct. 3405, 3418, 82 L. Ed. 2d 677 (1984) (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S. Ct. 2313, 2318, 45 L. Ed. 2d 374 (1975)). This Court has applied the exception when an officer relied on binding appellate

precedent or a subsequently invalidated statute. *State v. Edwards*, 2014 S.D. 63, ¶ 19, 853 N.W.2d 246, 254; *accord Davis*, 564 U.S. at 249, 131 S. Ct. at 2434. We have also declined to exclude evidence when an officer made an objectively reasonable mistake when executing a warrant. *Hess*, 2004 S.D. 60, ¶ 21, 680 N.W.2d at 323-24 (executed warrant at the wrong house). More often, we have applied the exception when an officer relied on a warrant in good faith before conducting a search or seizure and the issue on appeal was whether the warrant was invalid. *State v. Running Shield*, 2015 S.D. 78, ¶ 12, 871 N.W.2d 503, 508; *Sorensen*, 2004 S.D. 108, ¶ 18, 688 N.W.2d at 200; *State v. Saiz*, 427 N.W.2d 825, 828 (S.D. 1988).

[¶48.]     Here it is troubling that Detective Rogers had the pole camera installed solely in response to a tip that Jones may be dealing large quantities of marijuana. Detective Rogers did not independently acquire suspicion of criminal activity. He simply received the tip and installed the pole camera to be directed at Jones's trailer. But this is not to say Detective Rogers acted in bad faith or that suppression of the evidence would deter law enforcement wrongdoing. The circuit court found that "Detective Rogers was not aware of any prior uses of pole cameras by law enforcement where a search warrant was required prior to its installation." Based on the facts of this case, Detective Rogers acted reasonably, and the circuit court did not err when it denied Jones's motion to suppress based on the good faith exception to the exclusionary rule.

[¶49.]     Reversed in part and affirmed in part.

[¶50.]     SEVERSON and KERN, Justices, concur.

#27739

[¶51.]    GILBERTSON, Chief Justice, and ZINTER, Justice, dissent.


GILBERTSON, Chief Justice (dissenting).

[¶52.]    Respectfully, I dissent.  Today, the Court holds that the U.S. Constitution requires law enforcement to obtain a search warrant before conducting "long-term surveillance" (in this case, two-month video surveillance) of the front of a residence from a public vantage point.  Yet, the United States Supreme Court "has to date not deviated from the understanding that mere visual observation does not constitute a search." *United States v. Jones*, 565 U.S. 400, 412, 132 S. Ct. 945, 953, 181 L. Ed. 2d 911 (2012).  Accordingly, courts throughout this nation have overwhelmingly—if not unanimously—acknowledged the same.  This Court has failed to identify even a single opinion holding that an officer needs a warrant to record with a camera that which can be viewed by the naked eye without a warrant.  This decision stands alone in its holding despite the fact that this is hardly a case of first impression.  In light of the United States Supreme Court's explicit statement in *Jones*, as well as an overwhelming body of persuasive authorities, I would affirm the circuit court's denial of Jones's motion to suppress evidence on the merits without resorting to the good-faith exception.

[¶53.]    The State may not unreasonably search or seize an individual.  U.S. Const. amend. IV; S.D. Const. art. VI, § 11.  Under the Fourth Amendment, "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure[.]"  *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968).  Unless an exception applies, observation is a

-25-

search in the constitutional sense when accomplished by government trespass into an area protected by the Fourth Amendment. *Jones*, 565 U.S. at 406, 132 S. Ct. at 950 ("[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates."). Even when a trespass does not occur, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 2042, 150 L. Ed. 2d 94 (2001).

[¶54.]     This case does not involve a physical trespass into a protected area; therefore, we must determine whether Jones exhibited a subjective expectation of privacy that is objectively reasonable. Under the first prong, Jones has not established that he subjectively believed his activities in front of his home—in particular, dumping his trash—were concealed from public view. As the State points out, "[Jones's] trailer was not obstructed by any fence, gate, or anything else that blocked its view from the public street or pole camera." *See United States v. Bucci*, 582 F.3d 108, 116-17 (1st Cir. 2009) ("There are no fences, gates or shrubbery located in front of Bucci's residence that obstruct the view of the driveway or the garage from the street. Both are plainly visible."). Jones's briefs to this Court do not even claim—let alone prove—that Jones subjectively believed his activities in front of his home were concealed from public observation. Likewise, although the Court's opinion includes a section labeled "Subjective Expectation of Privacy," *supra* ¶¶ 27-31, that section is devoted entirely to discussing whether it was *possible* for

Jones to have a subjective expectation of privacy—not whether he *actually* had one. After concluding Jones could have had one, the Court simply assumes that he did.[3]

[¶55.] Even if we assume that Jones subjectively believed his activities in front of his home were concealed from public observation, such a belief would not be objectively reasonable. The United States Supreme Court has long held that "the mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812, 90 L. Ed. 2d 210 (1986). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576 (1967). Thus, "visual observation [of the portion of a house that is in plain public view] is no 'search' at all[.]" *Kyllo*, 533 U.S. at 32, 121 S. Ct. at 2042. The Supreme Court "has to date not deviated from the understanding that *mere visual observation does not constitute a search*." *Jones*, 565 U.S. at 412, 132 S. Ct. at 953 (emphasis added) (citing *Kyllo*, 533 U.S. at 31-32, 121 S. Ct. at 2041-42).

[¶56.] Despite the *Jones* majority's unambiguous affirmation that mere visual observation does not constitute a search, this Court now claims "there is no

---

3. According to the Court, Jones "claims that he had a subjective expectation of privacy in the whole of his movements. In particular, he asserted that he expected to be free from 24/7 targeted, long-term observation[.]" *Supra* ¶ 28. But this claim is unsupported. Jones's argument to this Court consists almost entirely of analogizing this case to *State v. Zahn*, 2012 S.D. 19, 812 N.W.2d 490. Nowhere does Jones claim to have had a subjective expectation of privacy.

controlling law" that "concerns long-term, remote surveillance[.]" *Supra* ¶ 40.

Based on this claim, the Court adopts a new Fourth Amendment theory advanced

by Justice Alito in his four-vote, concurring opinion in *Jones*.[4]  According to the

Court, surveillance may become a search within the meaning of the Fourth

Amendment based on the quality and quantity of information obtained.  *See supra*

¶¶ 34-35.  Thus, because the Court finds that visually observing the front of Jones's

residence for eight weeks produced a "wealth" of personal information, *supra* ¶ 36,

the Court concludes the use of a pole camera in this case was a search.

[¶57.]        The Court's claim that the constitutionality of long-term surveillance is

an open question, *supra* ¶ 34, is incorrect.  The Court supports this claim by citing

but not quoting *Jones*, 565 U.S. at 412, 132 S. Ct. at 954.  Yet, this portion of the

*Jones* opinion does not even mention the duration of surveillance let alone indicate

that such is a factor in determining whether a search has occurred.  Even if it did,

the Supreme Court has indicated that even year-long visual observation of a

residence is not a search under the Fourth Amendment.  *See Kyllo*, 533 U.S. at 35

n.2, 121 S. Ct. at 2043 n.2.  If a period of one year is not "too long," then neither is

the eight-week period at issue in this case.

[¶58.]        More importantly, the notion that observation through electronic,

sense-enhancing means may be a search under the Fourth Amendment is hardly a

---

4.    The Court suggests Justice Alito's view is controlling because according to the
      Court, Justice Sotomayor "endorsed" Justice Alito's writing.  *Supra* ¶¶ 19, 25.
      Yet, Justice Sotomayor did not join Justice Alito's writing.  In fact, she
      explicitly joined the majority opinion, which declined to reach the issues
      raised by Justice Alito.  *Jones*, 565 U.S. at 418, 132 S. Ct. at 957 (Sotomayor,
      J., concurring).

new concept; the Supreme Court said the same in *Kyllo*, 533 U.S. at 34, 121 S. Ct. at 2043. In that case, the Supreme Court considered "whether the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a 'search' within the meaning of the Fourth Amendment." *Id.* at 29, 121 S. Ct. at 2040-41. In concluding that such surveillance does constitute a search, the Supreme Court distinguished mere visual observation from law enforcement's use of "sense-enhancing technology[.]" *Id.* at 34, 121 S. Ct. at 2043. The Supreme Court held: "Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40, 121 S. Ct. at 2046. Thus, the *Jones* majority's electronic-means statement does not suggest an "open question"; it simply refers to existing precedent.[5]

[¶59.]     Even if the *Jones* majority's reference to *Kyllo's* electronic-means analysis could be read as indicating the constitutionality of long-term surveillance is an open question, this Court should not follow Justice Alito's concurring opinion.[6]

---

5.  The Court dismisses *Kyllo*, which was decided in 2001, as a case decided "years ago." *Supra* ¶ 22. United States Supreme Court opinions do not have expiration dates. Moreover, in the very next paragraph, the Court relies on *Kyllo* for the Court's central proposition—that the advance of technology affects the public's expectation of privacy. *See supra* ¶ 23.

6.  The Court cites *State v. Zahn*, 2012 S.D. 19, 812 N.W.2d 490, as if this Court had already adopted the quality-and-quantity-of-information theory. *See supra* ¶ 37. Although we discussed Justice Alito's concurring opinion from *Jones* in *Zahn*, we did so only after applying the *Jones* majority's physical-trespass analysis to conclude a search had occurred. *Zahn*, 2012 S.D. 19, ¶ 19, 812 N.W.2d at 496. Two of the five justices on this Court disagreed

(continued . . .)

Not only did a majority of the Supreme Court decline to adopt the quality-and-quantity-of-information approach in *Jones*, the Supreme Court has previously said that "[t]he Fourth Amendment's protection of the home has *never* been tied to measurement of the quality or quantity of information obtained." *Kyllo*, 533 U.S. at 37, 121 S. Ct. at 2045 (emphasis added). Rather, the question whether police conduct constitutes a search depends on the *method* of surveillance, not the *product* of surveillance. *Id.* at 37-40, 121 S. Ct. at 2045-46.[7] The *Jones* majority's electronic-means statement only confirms this view. If the quality and quantity of information obtained dictates whether surveillance is a search, then the method of obtaining that information should not matter; yet, this conclusion is clearly contrary to *Jones*. *See Jones*, 565 U.S. at 412, 132 S. Ct. at 953-54 (observing that one method of surveillance may be constitutional even though obtaining *the same information* via another method is unconstitutional).

[¶60.] So contrary to the Court's claim that there is no controlling authority, *supra* ¶ 40, this case is squarely controlled by, e.g., *Kyllo* and *Katz*. And under these binding opinions, the question that should be addressed in this case is

---

(. . . continued)
 with issuing that dictum. The remaining three justices found it "appropriate" only because "both parties focused on the application of the *Katz* 'reasonable expectation of privacy' test" and because "[a]t the time [the] case was argued, the United States Supreme Court had not yet decided *Jones*." *Zahn*, 2012 S.D. 19, ¶ 20 n.3, 812 N.W.2d at 496 n.3. Thus, *Zahn's* dictum is specifically confined to that case.

7. If the need for a warrant depends on the product of surveillance, law enforcement will not know whether a warrant is required until after the surveillance has been conducted. In practice, then, law enforcement should seek a warrant for any surveillance from a public vantage point lest this Court subsequently consider the surveillance too successful.

whether the device used by the State is "in general public use" and whether the State used that device "to explore details of the home that would previously have been unknowable without physical intrusion[.]" *Kyllo*, 533 U.S. at 40, 121 S. Ct. at 2046. Contrary to the Court's suggestion that this case implicates the "advance of technology[,]" *supra* ¶ 23 (quoting *Kyllo*, 533 U.S. at 33-34, 121 S. Ct. at 2043), video cameras have been in general public use for years, if not decades. The camera at issue here was not equipped with night vision, let alone structure-penetrating detection like the thermal-imaging device at issue in *Kyllo*. 533 U.S. at 29, 121 S. Ct. at 2041. Rather, the camera observed only that which is also observable by the naked eye. In short, law enforcement did not utilize sense-enhancing technology; they simply employed a device that is in general public use.[8]

[¶61.]    Moreover, the State did not use the video camera "to explore details of the home that would previously have been unknowable without physical intrusion[.]" *Id.* at 40, 121 S. Ct. at 2046. The circuit court found that "the pole camera could not see *inside* of [Jones's] residence or in the backyard[.]" (Emphasis added.) And as noted above, there were no obstructions preventing public

---

8.    The Court claims "the pole camera is not a mere video camera" because of how it was used: "The pole camera captured Jones's activities outside his home twenty-four hours a day, sent the recording to a distant location, and allowed the officer to view it at any time and to replay moments in time." *Supra* ¶ 36. Yet as noted above, the camera at issue was not equipped with night vision—its capabilities were subject to the same limitations as the human eye—so the *effective* observation time was not 24 hours per day. Moreover, contrary to the Court's dated view of technology, streaming video is in widespread use in a variety of applications. From Netflix to smart homes and wireless nanny cams, watching live or recorded images on demand (including the ability to "replay moments in time[,]" *supra* ¶ 36) from a distant location is commonplace.

observation of Jones's residence. This point alone has been sufficient for essentially every other court in the nation that has addressed this issue to conclude that surveillance accomplished by placing a video camera in a public place is not a search under the Fourth Amendment. *See United States v. Houston*, 813 F.3d 282, 287-88 (6th Cir. 2016) (upholding 10-week surveillance), *cert. denied*, ___ U.S. ___, 137 S. Ct. 567, 196 L. Ed. 2d 448 (2016); *Bucci*, 582 F.3d at 116-17 (upholding eight-month surveillance); *United States v. Gonzalez*, 328 F.3d 543, 548 (9th Cir. 2003); *United States v. Jackson*, 213 F.3d 1269, 1280-81 (10th Cir. 2000), *vacated on other grounds*, 531 U.S. 1033, 121 S. Ct. 621, 148 L. Ed. 2d 531 (2000); *United States v. Pratt*, No. 16-cr-20677-06, 2017 WL 2403570, at *5 (E.D. Mich. June 2, 2017) (upholding 14-month surveillance); *United States v. Bailey*, No. 15-CR-6082G, 2016 WL 6995067, at *33 (W.D.N.Y. Nov. 29, 2016); *United States v. Campuzano-Chavez*, No. CR-15-00154-HE, 2016 WL 879326, at *4 (W.D. Okla. Mar. 7, 2016); *United States v. Gilliam*, Nos. 02:12-cr-93, 02:13-cr-235, 2015 WL 5178197, at *9 (W.D. Pa. Sept. 4, 2015); *United States v. Garcia-Gonzalez*, No. 14-10296-LTS, 2015 WL 5145537, at *9 (D. Mass. Sept. 1, 2015) (upholding six-month surveillance); *United States v. Root*, No. 2:14-CR-0001-TOR-2, 2014 WL 4715874, at *6 (E.D. Wash. Sept. 22, 2014) ("Defendant does not have a legitimate expectation of privacy in activities which occurred in that public alleyway, readily observable by any passerby."); *United States v. Moore*, No. 14-20206-CR, 2014 WL 4639419, at *2-3 (S.D. Fla. Sept. 16, 2014) (upholding eight-month surveillance); *United States v. Wymer*, 40 F. Supp. 3d 933, 939-40 (N.D. Ohio 2014) (upholding four-month surveillance); *Martinez-Turcio v. United States*, Cr. No. 6:10-cr-00054-

GRA-1, C/A No. 6:13-cv-01139-GRA, 2013 WL 12106924, at *9-10 (D.S.C. Oct. 18, 2013); *United States v. Baltes*, No. 8:11-cr-282 (MAD), 2013 WL 11319002, at *7 (N.D.N.Y. Apr. 22, 2013); *United States v. Nowka*, No. 5:11-CR-474-VEH-HGD, 2012 WL 6610879, at *5 (N.D. Ala. Dec. 17, 2012) (upholding eight-month surveillance because "what could be seen on the surveillance recording was in no way different (other than angle of view) from that which any person could see from the public street"); *United States v. Brooks*, 911 F. Supp. 2d 836, 843 (D. Ariz. 2012) (upholding five-month-long surveillance because it "was 'a prudent and efficient use of modern technology' to enhance their sense of sight and allowed for law enforcement to see 'what may be seen' from a public vantage point where they had a right to be"); *United States v. Aguilera*, No. 06-CR-336, 2008 WL 375210, at *2 (E.D. Wis. Feb. 11, 2008) ("[The] substitution of a camera for in-person surveillance does not offend the Fourth Amendment . . . ."); *United States v. Clarke*, No. CRIM.3:04 CR SRU, 2005 WL 2645003, at *2 (D. Conn. July 19, 2005) (upholding eight-month surveillance); *United States v. West*, 312 F. Supp. 2d 605, 616 (D. Del. 2004); *Rodriguez v. United States*, 878 F. Supp. 20, 24 (S.D.N.Y. 1995); *State v. Duvernay*, No. 1-16-62, 2017 WL 2537559, at *3-6 (Ohio Ct. App. June 12, 2017) (upholding nine-day surveillance).[9]  And now, because of the Court's decision today, this

---

9.     The Court dismisses the cases in this list that were decided prior to *United States v. Jones*.  *See supra* ¶¶ 16-17.  The Court premises its dismissal of the pre-*Jones* cases on the erroneous conclusion that *Jones* changed existing precedent.  But as noted above, Justice Alito's writing received only four votes—not five.  *Supra* ¶ 56 n.4.  Simply put, *Jones* did not change the conclusion that a person does not have a reasonable expectation of privacy in his public movements.  1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.7(g) (5th ed.), Westlaw (database updated Oct.

(continued . . .)

overwhelming body of authority may be followed by a solitary dissenting opinion:

*But see State v. Jones*, 2017 S.D. ___, ___ N.W.2d ___.

[¶62.]    I agree that the thought of a surveillance camera on every utility pole may be concerning to many.  But contrary to the Court's view, stretching the Fourth Amendment in contravention of controlling precedent is not the answer.  If the Court's fear of an "Orwellian . . . surveillance society," *supra* ¶ 37, actually becomes reality, the people of South Dakota—through their elected representatives in the Legislature—are more than capable of regulating law enforcement's use of long-term surveillance.[10]  As Justice Alito noted in the writing the Court seeks to adopt today, the best solution to such concerns is legislative—not judicial.  *Jones*, 565 U.S. at 429-30, 132 S. Ct. at 963-64 (Alito, J., concurring in the judgment).  The legislative solution allows for public input and permits the people's elected

_____

(. . . continued)

> 2016) (citing *United States v. Knotts*, 460 U.S. 276, 281, 103 S. Ct. 1081, 1085, 75 L. Ed. 2d 55 (1983)).

> The Court dismisses even the cases that were decided after *Jones* because they do not address "the aggregate nature of the surveillance[.]"  *Supra* ¶ 20.  Yet, the Court of Appeals for the Sixth Circuit explicitly "rejected the claim that the length of the period of monitoring [can make] surveillance constitutionally unreasonable[.]"  *United States v. Powell*, 847 F.3d 760, 773 (6th Cir. 2017).  Moreover, the Court's argument begs the question whether the aggregate nature of public surveillance is relevant under current Fourth Amendment jurisprudence.  These cases do not address aggregation because as noted in this footnote, the *Jones* majority did not hold that aggregation is relevant.  Given the Court's inability to identify even a single opinion that holds as it does, the problem lies in the Court's assumption that aggregation is relevant rather than in the analysis of the numerous authorities cited above.

10.    For example, the Legislature could restrict the duration of warrantless surveillance to two weeks (or some other arbitrary length of time).

representatives in the Legislature—rather than three members of this Court—to "gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way." *Id.* at 429-30, 132 S. Ct. at 964. It would further allow for changing statutes to meet with changing times. If this Court undervalues the public's concern for privacy as compared to its concern for public safety, the Legislature can always compensate. However, because the Court decides this case as an issue of constitutional law, the Legislature will be powerless to properly balance the competing public interests if this Court overvalues the perceived public interest in privacy.[11] The citizens of South Dakota would be locked out of the process unless 35 states were to amend the United States Constitution.

[¶63.] Existing, controlling precedent is clear: mere visual observation does not constitute a search. *Id.* at 412, 132 S. Ct. at 953 (majority opinion). Law enforcement did not use sense-enhancing technology; they observed only that which was observable by the naked eye. Therefore, even if Jones had argued and proved he had a subjective expectation of privacy, such expectation would not have been objectively reasonable. Because the United States Supreme Court has explicitly

---

11. The Court insists that it does not "prevent the Legislature from regulating long-term surveillance, including surveillance for longer than two months." *Supra* ¶ 41. But this conclusory claim is unsupported. The Court's opinion repeatedly states the issue as deciding whether "long-term surveillance" is a search within the meaning of the U.S. Constitution. *See supra* ¶¶ 28-29, 33-36, 40. It is an elementary principle of constitutional law that the South Dakota Legislature has no power to unilaterally alter the meaning of the U.S. Constitution. According to the Court, the U.S. Constitution proscribes a two-month surveillance of the front of a residence from a public vantage point. Because the U.S. Constitution provides a floor of protection, the Legislature could not possibly authorize warrantless surveillance of two months' duration or longer—not even if every person in South Dakota thought such surveillance was reasonable.

and implicitly rejected the quality-and-quantity-of-information approach, this Court must as well.  If the controlling law is to change, such change should come either from the United States Supreme Court or the South Dakota Legislature.  I would affirm the circuit court.  I would not reach the good-faith issue.

[¶64.]　　　ZINTER, Justice, joins this dissent.