The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Fred SHORTY, Defendant-Appellee.

No. 86SA309.

Supreme Court of Colorado, En Banc.

Jan. 20, 1987.

Norman S. Early, Dist. Atty., Nathan B. Coats, Chief Appellate Deputy Dist. Atty., Donna Skinner Reed, Deputy Dist. Atty., Denver, for plaintiff-appellant.

Lozow, Lozow and Elliott, Charles W. Elliott, Michael D. Shangraw, Denver, for defendant-appellee.

ERICKSON, Justice.

This interlocutory appeal by the prosecution is from an order suppressing a packet of cocaine found under a two feet square piece of carpeting that was serving as a doormat in front of a basement apartment. We reverse and remand with directions.

### I.

The apartment in question is seven steps below ground level, and has a private entrance not in common with other residences in the building. The defendant stayed in the apartment from time to time. The defendant claimed that he was renting the apartment, although the utility bills came to one the defendant's girlfriends, and the defendant did not have a key to the apartment at the time of his arrest. Three informants who had provided reliable information in the past reported to the police that the defendant was selling cocaine from the apartment. The informants described the defendant as a black male, in his late thirties, and 5'10" in height. The police were also told that the defendant drove an orange Volkswagen Beetle, which the police had seen in the area.

The informants described a simple procedure the defendant used to advise his potential customers that he had cocaine to sell. Day or night, if the porch light was on, the defendant had cocaine for sale. If the porch light was off, the defendant did not have cocaine for sale. Sporadic surveillance of the apartment confirmed the informants' reports. When the porch light was on, even during the daytime, the police officers observed many visitors to the apartment. When the porch light was off, the apartment was quiet.

On January 27, 1986, in the afternoon, Detectives Stephen Barnhill and George Fortunato drove by the apartment in an unmarked police car.[1] As they approached the apartment, they saw an individual near the apartment who matched the defendant's description. The individual was watching the detectives, and when they came to a stop sign in front of the building, they noticed that the individual was continuously looking over his shoulder, and appeared nervous as he walked down the stairway to the apartment. When he got to the bottom of the stairwell, he continued to watch the police as they proceeded down the street. According to Detective Barnhill, the individual appeared to be playing a "cat and mouse" game with them, because his head would disappear and then reappear to watch their car.

The detectives turned their car around, parked, walked across the lawn to the apartment, and met the defendant coming out of the stairwell. The detectives advised the defendant that they were police officers, and the defendant replied, "yeah, I know." The defendant told the detectives that he was locked out of the apartment, and that he was waiting for his girlfriend to let him in. The defendant was asked for identification, and he produced a driver's license.

Detective Fortunato took the defendant's driver's license, and ran a radio check on the defendant to determine whether he was

---

1. In June 1985, Detective Barnhill executed a search warrant on the apartment, but found no drugs.

wanted. At the same time, Detective Barnhill went down the stairwell, rang the doorbell, and found that no one was at home. At the bottom of the stairwell, he saw a worn piece of carpeting, approximately two feet square, covering a concrete drain. Detective Barnhill lifted the carpet and found a plastic bag containing white folded paper which, in the detective's opinion, was of a type used to package cocaine. The defendant, when questioned about the packet, told the police officer that it was not his. The defendant was arrested and the contents of the packet were subsequently analyzed. The analysis confirmed the detective's suspicion that the substance in the folded paper was cocaine. The defendant was charged with possession of a schedule II controlled substance, a class three felony, pursuant to section 18–18–105, 8B C.R.S. (1986).

## II.

The issue before us is whether the rights guaranteed to a citizen against unlawful search and seizure under both the United States and Colorado Constitutions require suppression of the packet of cocaine that Detective Barnhill found under the small piece of carpet in front of the apartment door. We reverse the trial court's order of suppression and remand for further proceedings consistent with this opinion.

The trial court properly found that the police officers had a specific and articulable basis for suspecting criminal activity, and that the purpose, scope, and character of the investigatory stop was reasonable. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (a reliable informant's tip can be a reasonable basis for making an investigatory detention); *People v. Archuleta*, 616 P.2d 977 (Colo.1980) (the police may detain a suspect and require

that he produce identification if they have a reasonable suspicion that the suspect is involved in criminal conduct). The *Stone-Tate*[2] basis for an investigatory stop has as its foundation the trilogy of cases announced with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and has been codified by the General Assembly in section 16–3–103, 8A C.R.S. (1986).[3] Here, the police investigatory stop was proper, and the actions of the police officers did not go beyond the legitimate ends of an investigatory stop. The defendant was patted down for weapons, identified, and questioned about his conduct.

Although the police had neither probable cause nor a warrant to search the area underneath the doormat, that area was not constitutionally protected from an unauthorized search. In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court recognized that the Fourth Amendment does not protect a defendant from police intrusions that do not abridge a legitimate expectation of privacy. *Id.* at 360, 88 S.Ct. at 507 (Harlan, J., concurring). *See also People v. Oates*, 698 P.2d 811, 814 (Colo.1985). The existence of a legitimate expectation of privacy must be determined after examining all the facts and circumstances in a particular case. *People v. Oates*, 698 P.2d at 819. While the Supreme Court has held that the curtilage surrounding one's home may be protected under the Fourth Amendment, *see Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the fact that a search occurs within the curtilage is not dispositive if the area's public accessibility dispels any reasonable expectation of privacy. *United States v. Smith*, 783 F.2d 648 (6th Cir.1986). *See also California v. Ciraolo*, — U.S. —,

---

**2.** *People v. Tate*, 657 P.2d 955 (Colo.1983); *Stone v. People*, 174 Colo. 504, 485 P.2d 495 (1971).

**3.** Section 16–3–103, 8A C.R.S. (1986) provides:
(1) A peace officer may stop any person who he reasonably suspects is committing, has committed, or is about to commit a crime and may require him to give his name and address, identification if available, and an ex-

planation of his actions. The stopping shall not constitute an arrest.
(2) When a peace officer has stopped a person for questioning pursuant to this section and reasonably suspects that his personal safety requires it, he may conduct a pat-down search of that person for weapons.

106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986); *State v. Seagull*, 95 Wash.2d 898, 632 P.2d 44 (1981). In conducting a criminal investigation, a police officer may enter those residential areas that are expressly or impliedly held open to casual visitors. *State v. Seagull*, 95 Wash.2d 898, 632 P.2d 44 (1981). *See generally* 1 J. Cook, *Constitutional Rights of the Accused* § 3:44, at 673–74 (1985). Reasonable expectations of privacy are diminished in common areas of multi-family dwellings. *See United States v. Romano*, 388 F.Supp. 101 (E.D.Pa.1975); *State v. Brown*, 198 Conn. 348, 503 A.2d 566 (1986).

The frayed piece of carpeting under which Detective Barnhill found cocaine was in an area open to the public, and was not secured to the landing in any manner. The police officers who were investigating narcotics transactions at the apartment had seen many people enter and then leave shortly thereafter. The carpet could be moved, tripped over, walked upon, looked under, or lifted up by any business or personal visitor. The defendant could not reasonably expect privacy in an unsecured area that was often visited by many people in the occupant's business or social use of the rental unit. Further, the defendant's interest in the area is lessened by the fact that his residence was transitory in nature. The record discloses that the defendant was an occasional overnight guest at another woman's house in the same neighborhood, and that the defendant claimed that house as his home during a narcotics arrest sixteen months prior to the incident in question. In these circumstances, we must conclude that even if the defendant had a subjective expectation of privacy in the area or the contraband found under the carpet fragment, his expectation is not one that society is prepared to recognize as reasonable.[4] *See United States v. Haughn*, 414 F.Supp. 37 (D.N.J.1976) (the

defendant does not have a reasonable expectation of privacy in the contents of a raincoat left on the landing of a stairway leading to the defendant's apartment).

In view of the defendant's actions, the police looked closely at the stairwell to determine if the defendant had disposed of contraband or a weapon to avoid arrest when questioned. Although he told the police that the packet did not belong to him, he admitted that he lived in the apartment with his girlfriend, whom he intended to "straighten out" for not being there when he arrived. The facts in this case are different than the factual scenario in *People v. Thomas*, 660 P.2d 1272 (Colo.1983), where the police officers found narcotics after an investigatory stop was made without a proper foundation. The sole issue in *Thomas* was whether the police had grounds for an investigatory stop.

Accordingly, we reverse the suppression order and remand for further proceedings consistent with this opinion.

KIRSHBAUM, J., concurs and specially concurs.

QUINN, C.J., dissents and LOHR, J., joins in the dissent.

KIRSHBAUM, Justice, concurring and specially concurring.

I agree with the majority opinion that under the particular circumstances of this case the defendant has failed to establish a reasonable expectation of privacy in the area beneath the rug in front of the door to his residence. I write separately to emphasize my view that the ruling in this case is limited in scope.

"[T]he Fourth Amendment protects people, not places." *See Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The trial court made a finding, supported by the record,

---

4. Because we hold that the defendant did not have a legitimate expectation of privacy in the area beneath the carpet, it is unnecessary to address the defendant's standing to raise the constitutionality of the search. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The issue of the defendant's standing to question the search is not before us and for that reason we do not address the issue.

that the defendant had a subjective privacy interest in the area under the rug. However, in order for the defendant to claim a constitutionally protected expectation of privacy in the area, he must have exercised substantial control over that area to satisfy the objective standard of reasonableness that would justify such subjective expectation. *See United States v. Holland,* 755 F.2d 253 (2d Cir.), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985); *State v. Brown,* 198 Conn. 348, 503 A.2d 566 (1986). The defendant here was not the only person with a key to the front door of the residence in question. He frequently spent time away from the residence, and permitted friends to use the unit in his absence. The area in question provides the only approach to the residence for postal workers and merchants. Other individuals traversed this area during those times when the porch light signalled the availability of cocaine. Given the frequency and variety of use by others, it cannot reasonably be said that the defendant exercised such control over the area as to warrant constitutional protection for his asserted privacy interest. However, in a different context another occupant of a similar residence might well possess a constitutionally protected expectation of privacy in an area intimately connected with the dwelling place. *See California v. Ciraolo,* — U.S. ——, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

QUINN, Chief Justice, dissenting:

The court today holds that a person residing in an apartment has no legitimate expectation of privacy in the area under a doormat immediately outside the entrance of the apartment. The effect of the court's holding is to authorize a law enforcement officer to intrude into and conduct an examination of an area traditionally recognized as part of the curtilage of the home, even though the officer has no cause whatever, probable or otherwise, to believe that incriminating evidence will be found in the area examined. I believe that the Fourth Amendment to the United States Constitu-

tion and Article II, section 7 of the Colorado Constitution contemplate greater privacy protections for persons living in this state than the court today is willing to recognize. I therefore dissent.

I.

The facts of this case, while not complicated, are critical to a proper resolution of the issue raised on this interlocutory appeal. On January 27, 1986, the defendant, Fred Shorty, was living in a rented basement apartment at 5595 East 36th Avenue in Denver, Colorado. The defendant testified at the suppression hearing that he had been living in this apartment with his girl friend for approximately eighteen months prior to the date of his arrest and that he maintained no other residence. The apartment is below the street level and is accessible by a stairwell leading down to the apartment door. At the foot of the stairwell and immediately outside the door to the apartment is a concrete landing approximately four feet square which serves as a threshold or entranceway into the apartment itself. The stairwell leads to the defendant's apartment only and does not serve as a common entranceway to other apartments in the building.

On the day in question Denver police detectives Stephen Barnhill and George Fortunato were conducting a sporadic surveillance of the defendant's apartment, having previously been advised that the defendant was selling cocaine from that location. Although the officers did not personally know the defendant, they had been furnished a general description of his physical characteristics.

At approximately 1:45 p.m. on January 27 the officers, dressed in plainclothes, drove an unmarked vehicle past the defendant's apartment. Upon noticing that the defendant was standing a short distance from the stairwell, the officers stopped their vehicle and watched the defendant as he walked down the stairs to the landing area directly outside the front door of the apartment. When the defendant reached the bottom of the stairs, he turned around

and continued to look in the direction of the officers.

The officers exited their vehicle and walked toward the stairwell. The defendant walked up the stairs and met the officers at the top of the stairwell. After the officers identified themselves and asked the defendant for identification, the defendant told them that he was Fred Shorty and produced a driver's license as verification.

Detective Barnhill at this time conducted a limited pat-down search of the defendant for weapons and found none. In response to the officer's inquiry about the defendant's conduct, the defendant stated that he lived in the basement apartment and that he had given his keys to his girl friend and expected her to be inside but she apparently had not yet returned. Detective Barnhill walked down the stairwell to the landing to see if the defendant had disposed of any drugs or weapons in that area. The detective checked the front door and found that it was locked. He then rang the doorbell but no one came to the door.

After visually examining the stairwell for contraband or a hidden weapon and seeing no such objects, Detective Barnhill examined the doormat and saw no bulge or any other configuration that might indicate that something had been placed underneath the doormat. Although the detective acknowledged in the suppression testimony that he had no reason to believe that there were narcotics or any other incriminating evidence under the doormat, he nonetheless lifted the doormat and made an examination of the area underneath. He observed a plastic bag with a white paper packet inside, similar to material used to package cocaine, and seized this material. The officers then placed the defendant under arrest for possession of a controlled substance and transported him to the stationhouse.

The district court granted the defendant's motion to suppress. After expressly finding that the defendant's residence in the apartment established a legitimate expectation of privacy sufficient to permit him to challenge the seizure of the plastic bag, the court ruled that the defendant had a subjective expectation of privacy in the area under the doormat and that this expectation of privacy was a reasonable one. Although the court ruled that the officers had the right to question the defendant for identification, to conduct a pat-down search for weapons, and to visually examine the staircase for any evidence that might be in plain view, it concluded that Detective Barnhill had no reason to believe that drugs were concealed under the doormat and therefore had no right to lift up the doormat and to search the underlying area for drugs or evidence. The People thereafter filed this interlocutory appeal challenging the order of suppression.

## II.

For constitutional purposes, "a 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *see, e.g., People v. Unruh,* 713 P.2d 370, 377 (Colo.1986), *cert. denied* — U.S. —, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property." *Jacobsen,* 466 U.S. at 113, 104 S.Ct. at 1656. There can be no question here that a seizure indeed did occur in this case, since Detective Barnhill took the plastic bag into his possession for use as evidence against the defendant. The only issue is whether Detective Barnhill, prior to seizing this evidence, engaged in a "search." The answer to this question depends on whether the defendant had a legitimate expectation of privacy in the area under the doormat immediately outside the door to his apartment. The legitimacy of the defendant's expectation of privacy depends, in turn, on whether he manifested a subjective expectation of privacy in the area involved in the search and whether society is willing to recognize that expectation as a reasonable one. *California v. Ciraolo,* 476 U.S. —, —, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215 (1986); *Unruh,* 713 P.2d at 377.

Since the district court expressly found and this court assumes that the defendant harbored a subjective expectation of privacy in the area under the doormat immediately outside the entranceway to his apartment, and as well in the plastic bag placed thereunder, there is no need to discuss this aspect of the case other than to state that both the district court's finding and this court's assumption proceeds from the rather obvious fact that the purpose of placing an object in that location is to conceal that item from the view of others. What the majority of this court turns its decision on is the defendant's lack of a legitimate expectation of privacy in the area under the doormat or in the plastic bag hidden under the doormat. In the majority's view, such an expectation "is not one that society is prepared to recognize as reasonable." Maj.Op. at 682. With this conclusion I disagree.

### III.

A legitimate expectation of privacy obviously means more than a subjective expectation that an object will not be discovered. In determining whether society is prepared to recognize one's expectation of privacy as "reasonable" for constitutional purposes, it is appropriate to test that expectation "against the customs, values and common understandings that confer a sense of privacy upon many of our basic social activi-

ties." *People v. Oates*, 698 P.2d 811, 816 (Colo.1985). Several factors point to the conclusion that the defendant's expectation of privacy in the area under the doormat immediately outside his apartment, as well as in the plastic bag hidden thereunder, was a reasonable one that was entitled to constitutional protection.

### A.

Of primary importance to the reasonableness of a privacy expectation is the nature of the area subjected to the challenged governmental intrusion. The entranceway to the defendant's apartment was within the curtilage of the apartment itself. The curtilage is that area to which extends the intimate activity associated with the sanctity of the home and the privacies of life. *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). As the Supreme Court recently observed, "[t]he protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Ciraolo*, 476 U.S. at ——, 106 S.Ct. at 1812, 90 L.Ed.2d at 216. In contrast to open fields surrounding a home, the curtilage has been considered part of the home itself for Fourth Amendment purposes. *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742.[1]

---

1. In *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984), the United States Supreme Court held that an expectation of privacy in the open fields is not an expectation that society recognizes as reasonable, and thus is not entitled to constitutional protection:

    The historical underpinnings of the open fields doctrine also demonstrate that the doctrine is consistent with respect for "reasonable expectations of privacy." As Justice Holmes, writing for the Court, observed in *Hester*, 265 U.S. [57] at 59 [44 S.Ct. 445, 446, 68 L.Ed. 898] the common law distinguished "open fields" from the "curtilage", the land immediately surrounding and associated with the home. *See* 4 W. Blackstone, Commentaries *225. The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the

    intimate activity associated with the "sanctity of a man's home and the privacies of life", *Boyd v. United States*, 116 U.S. 616, 630 [6 S.Ct. 524, 532, 29 L.Ed. 746] (1886), and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. *See, e.g., United States v. Van Dyke*, 643 F.2d 992, 993–994 (C.A. 4 1981); *United States v. Williams*, 581 F.2d 451, 453 (C.A. 5 1978); *Care v. United States*, 231 F.2d 22, 25 (C.A. 10), *cert. denied*, 351 U.S. 932 [76 S.Ct. 788, 100 L.Ed. 1461] (1956). Conversely, the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields.

In this case, Detective Barnhill made his observations only by picking up the doormat, which had been placed directly outside the door to the defendant's apartment and was within the basement entranceway to that apartment, and then by examining the area hidden from view by the doormat itself. As a resident of the apartment, the defendant would reasonably expect this area under the doormat to remain private as part of the curtilage of his home. Being within the curtilage, this area was entitled to enhanced privacy protection under both the United States and the Colorado Constitutions.

### B.

A second factor relating to the reasonableness of the defendant's privacy expectation is the use to which the defendant put the area in question. The defendant, as a resident of the apartment, had the right to use the area underneath the doormat to conceal objects from the view of others. The district court, in commenting on such use, noted that "[i]t is well known to all of us that people frequently use their door mats for concealing such items as keys and other things that they do not want other individuals to see or get a hold of." In my view, the defendant's use of the doormat as a place of concealment was no more unusual or abnormal than the use of a rainspout connected to the roof gutter as a hiding place, the use of the area underneath a milkbox on the front porch of a home for a similar purpose, or the use of the area underneath a porch planter as a place of concealment.

The mere fact that it might have been possible for a casual visitor to move or trip over the carpet is of speculative significance only, since that possibility did not eventuate in this case. More important, the record conclusively establishes that the plastic bag was well concealed under the doormat and was observable to the officer only when he lifted up the mat for the obvious purpose of examining the area underneath the mat. The use to which the defendant put the doormat in this case was a clear indicator of the reasonableness of his privacy expectation with respect to such use.

### C.

A third factor in determining the reasonableness of the defendant's privacy expectation is the police conduct that led to the observation and seizure of the plastic bag. I have no quarrel with the proposition that all observations made within the curtilage are not necessarily searches. As the United States Supreme Court observed in *Ciraolo:*

> That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activity clearly visible.

476 U.S. at —, 106 S.Ct. at 1812, 96 L.Ed.2d at 216. *See also People v. Donald,* 637 P.2d 392 (Colo.1981); *People v. Gomez,* 632 P.2d 586 (Colo.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). Since the stairway to the defendant's apartment was available for use by anyone visiting the defendant, Detective Barnhill had the right, as did any other person, to walk down the steps to the apartment door and observe what could be seen in plain view from that location.

The detective's observation of the plastic bag, however, was not a plain view observation made while he was positioned outside the doorway of the defendant's apartment. Rather, the observation was made only when the detective lifted up the doormat and looked underneath the doormat for incriminating evidence. This type of police

conduct has all the intrusive characteristics against which the United States and Colorado Constitutions are designed to protect.[2]

## IV.

Given the enhanced privacy interest attaching to the curtilage of one's home, I believe that the occupant of an apartment has a reasonable expectation of privacy in the area under a doormat immediately outside the entranceway to his apartment and in the plastic bag hidden thereunder. To hold otherwise reduces the curtilage doctrine to a virtual nullity and sanctions what in fact and law is nothing less than an exploratory search predicated on bare and inarticulable suspicion. Such open-ended searching authority is the very antithesis of the constitutional protections contemplated by the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution.

I would affirm the order of suppression.

I am authorized to say that Justice LOHR joins me in this dissent.

**2.** It simply begs the question to say, as does the majority, that a "search" occurring within the curtilage is not dispositive of the defendant's constitutional challenge as long as "the area's public accessibility dispels any reasonable expectation of privacy." Maj. Op. at 682. The precise issue in this case is whether a "search" in the constitutional sense did indeed occur by reason of the defendant's reasonable expectation of privacy in the area under the doormat, which area was admittedly within the entranceway to the apartment but also was clearly within the curtilage of the home.