The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 27, 2019

## 2019COA176

**No. 17CA1243, People v. Tafoya — Constitutional Law — Fourth Amendment — Searches and Seizures — Warrantless Search**

In a matter of first impression in Colorado, the division concludes that police use of a video camera installed at the top of a utility pole to conduct continuous video surveillance for more than three months of the defendant's fenced-in backyard constituted a warrantless "search" in violation of the Fourth Amendment to the United States Constitution.

COLORADO COURT OF APPEALS                                    2019COA176

Court of Appeals No. 17CA1243
El Paso County District Court No. 15CR4102
Honorable Barbara L. Hughes, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Rafael Phillip Tafoya,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE DAILEY
Richman and Brown, JJ., concur

Announced November 27, 2019

Philip J. Weiser, Attorney General, Trina K. Taylor, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Robert P. Borquez, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     Police, acting without a search warrant, installed a video camera near the top of a utility pole (the pole camera) to surveil the home of defendant, Rafael Phillip Tafoya.  For more than three months, the elevated camera provided police with continuous, recorded video surveillance of the area surrounding Tafoya's home, including an area behind his privacy fence.  Based on what police observed over that lengthy period, they obtained a search warrant, physically searched Tafoya's property, and found a large amount of controlled substances.

¶ 2     The issue in this case is whether the continuous, three-month-long use of the pole camera constituted a search under the Fourth Amendment to the United States Constitution.  We conclude that it did.

¶ 3     Because the trial court concluded otherwise, we reverse Tafoya's two convictions for possession with intent to distribute a controlled substance and his two conspiracy convictions and remand for a new trial.

*I.     Background*

¶ 4     A confidential informant told police about a possible drug "stash house" in Colorado Springs.  Based on specific information

1

provided by the informant, police identified Tafoya's home as the possible stash house.

¶ 5    Without applying for or obtaining a search warrant, police installed the pole camera near the top of a utility pole across the street from Tafoya's property.  Because the utility pole was across the street, police did not have to enter Tafoya's property to install it.

¶ 6    The pole camera continuously recorded video surveillance footage of Tafoya's property for more than three months from May 16, 2015, to August 24, 2015.  There is no indication that Tafoya knew his property was under surveillance.  Detectives could watch the video surveillance footage at the police station.  They reviewed already-recorded footage on a regular basis.  They also sometimes watched live-streaming footage as things were occurring on Tafoya's property.

¶ 7    The pole camera had some useful technological capabilities. From the police station, the detectives could pan the camera left and right and up and down.  The camera also had a zoom feature. With the live-streaming video surveillance, the zoom had buffering so, as explained at the suppression hearing, a detective could "see

2

very close to things, faces, to be able to identify objects, things of that nature."

¶ 8    At Tafoya's property, a long driveway runs from the street, along the side of Tafoya's home, to a detached garage in the backyard. A chain-link fence at the front of the property separates it from the public sidewalk. Farther into the property, as the driveway begins running along the side of the home, is a wooden privacy fence, approximately six feet high and including a gate across the driveway. Behind the privacy fence is the remainder of the driveway, which is next to the residence and in front of the detached garage. The pole camera provided an elevated view of Tafoya's property, including the area of the driveway behind his privacy fence, which could not be seen from the public sidewalk or the street.

¶ 9    On June 25, 2015 — when the pole camera had already been recording video surveillance footage for more than a month — police received a tip from an informant that a drug shipment would be delivered to Tafoya's house later that day. At the police station, a detective started watching live-streaming footage from the pole camera.

¶ 10    The detective saw a man named Gabriel Sanchez drive a car from the street up Tafoya's driveway.  Tafoya opened the gate on the privacy fence.  Sanchez drove the car past the privacy fence, and Tafoya closed the gate.  From the elevated view of the pole camera, the parked car was partially visible over the privacy fence.  With the camera zoomed in, the detective observed Tafoya bend down near the left front tire of the car.  But because that view was blocked by the privacy fence, precisely what Tafoya was doing at the left front tire could not be seen.  After many minutes of Tafoya bending down near the tire, the detective saw Tafoya and Sanchez carry two white plastic bags containing unknown items into the detached garage.

¶ 11    A pickup truck then drove from the street up Tafoya's driveway.  Men got out of the truck and moved a spare tire from the truck into Tafoya's garage.  Later, they moved the spare tire from the garage back to the truck and drove away.  Police later stopped the truck and found $98,000 in the spare tire.

¶ 12    The police continued recording video surveillance footage of Tafoya's property for two more months.  Then, on August 23, 2015, police received a tip from an informant that another drug shipment would arrive at Tafoya's property the next day.  On August 24, a

4

detective began viewing live-streaming footage of Tafoya's property, and ultimately observed similar activity. Sanchez drove the same car up Tafoya's driveway, Tafoya opened the gate, Sanchez drove the car past the privacy fence, and Tafoya closed the gate. Still, from the elevated view of the pole camera, the detective could see Tafoya again bend down near the left front tire of the car and then carry white plastic bags containing unknown items into the garage.

¶ 13 Police then obtained a search warrant and conducted a physical search of Tafoya's property. Inside the garage, they found two white garbage bags containing a total of approximately twenty pounds of methamphetamine and a half kilogram of cocaine.

¶ 14 The prosecution charged Tafoya with two counts of possession with intent to distribute controlled substances (methamphetamine and cocaine), and two counts of conspiracy to commit these offenses, and alleged that the crimes occurred during the date range of June 25, 2015, through August 24, 2015.

¶ 15 Tafoya filed a motion to suppress, arguing that the use of the pole camera constituted a warrantless search of his property in violation of the Fourth Amendment.

¶ 16    In the People's response, and at the suppression hearing, one of the People's arguments was that a person — hypothetically — could view the area of Tafoya's driveway behind the privacy fence from different vantage points.  The People introduced photographs at the suppression hearing from those vantage points.  For example, the privacy fence had very thin gaps between each of the wooden boards, so Tafoya's next-door neighbor hypothetically could have stood next to the privacy fence, peered through a thin gap, and seen what was occurring behind Tafoya's privacy fence on June 25, 2015, and August 24, 2015.  Also, a two-story apartment building with an exterior stairway leading up to one of the second-story apartments abuts Tafoya's backyard.  Again, hypothetically, the resident of that apartment, while standing at a particular spot on the stairway, could have seen what Tafoya was doing near the left front tire of the car on June 25, 2015, and August 24, 2015.

¶ 17    After considering evidence and argument presented at the suppression hearing, the trial court issued a written order denying the motion on the ground that Tafoya did not have a reasonable expectation of privacy in what was occurring behind his privacy fence because that area was exposed to the public, and therefore

the use of the pole camera did not constitute a search under the Fourth Amendment.   The court reasoned as follows:

- because the public could see into Tafoya's backyard from the apartment stairway behind Tafoya's home or from the top of the utility pole, "that . . . enabled law enforcement agents to see the alleged illegal activities from being carried out in pursuance of [Tafoya's] alleged drug dealing operations";[1]

- "[l]aw enforcement may use technology (including zoom, pan and tilt features of the pole camera) to 'augment[] the sensory faculties bestowed upon them at birth' without violating the Fourth [A]mendment" (quoting *United States v. Knotts*, 460 U.S. 276, 282 (1983));

- "the length of time" Tafoya's home "was placed under surveillance," and the impracticality of a utility worker perching on the pole during that time, did not convert the surveillance into a search because "'it is only the

---

[1] The court noted that "[t]he fact that the pole cam[era] saw the activities from a different vantage point than the one that could be viewed by the public is no bar to the admissibility of the evidence."

7

possibility that a member of the public may observe activity from a public vantage point — not the actual practica[bi]lity of law enforcement[]' doing so without technology — that is relevant for Fourth Amendment purposes" (quoting *United States v. Houston*, 813 F.3d 282, 289 (6th Cir. 2016)); and

- the long-term surveillance here was not like the "GPS tracking prohibited by the United States Supreme Court in [*United States v. Jones*, 565 U.S. 400 (2012),]" because "the privacy concerns implicated by a fixed point of surveillance are not so great as those implicated by GPS tracking" (quoting *Houston*, 813 F.3d at 290).[2]

¶ 18 At trial, the jury found Tafoya guilty on all counts, and the trial court sentenced him to fifteen years in the custody of the Department of Corrections.

---

[2] "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring).

## II. Did the Use of the Pole Camera Constitute a "Search"?

¶ 19    On appeal, Tafoya contends that the police violated the Fourth Amendment by using the pole camera to conduct a continuous, three-month-long surveillance of his backyard without first obtaining a search warrant.[3]  We agree.

### A. Standard of Review

¶ 20    When reviewing a suppression order, we defer to the district court's factual findings as long as evidence supports them, but we review de novo the court's legal conclusions.  *People v. McKnight*, 2019 CO 36, ¶ 21.

---

[3] He also asserts that the police violated the state constitutional search and seizure provision, Colo. Const. art. II, § 7.  Although Tafoya mentioned the state constitutional provision in his suppression motion, in the trial court he did not argue that it afforded him greater protections than the Fourth Amendment.  Nor did the trial court base its ruling on state constitutional grounds.  Under these circumstances, we limit our analysis to the federal constitutional issue.  *See People v. Rodriguez*, 209 P.3d 1151, 1156 (Colo. App. 2008) ("Where, as here, a defendant does not make a specific objection, *with a separate argument,* under the state constitution, we must presume the defendant's objections are based on federal, not state, constitutional grounds, and limit our review accordingly.") (emphasis added), *aff'd,* 238 P.3d 1283 (Colo. 2010); *see also People v. Holmes*, 981 P.2d 168, 170 n.3 (Colo. 1999) ("In the absence of a statement indicating that the decision rests on state grounds, we will presume that the court relied on federal law." (quoting *People v. Hauseman,* 900 P.2d 74, 77 n.4 (Colo. 1995))).

## B. First Things

¶ 21　　The United States Constitution protects people from unreasonable governmental searches and seizures. *See* U.S. Const. amend. IV. The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967)).

¶ 22　　"Warrantless searches are presumptively unreasonable[.]" *McKnight*, ¶ 22 (quoting *United States v. Karo*, 468 U.S. 705, 717 (1984)). A warrant is only required, however, for police action that constitutes a "search" or "seizure" under the Fourth Amendment. *Henderson v. People*, 879 P.2d 383, 387 (Colo. 1994).

¶ 23　　"A search occurs when the government intrudes on an area where a person has a 'constitutionally protected reasonable expectation of privacy.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). The cases recognize two aspects to the expectation of privacy — one subjective and one objective. Said another way, "[w]hen an individual 'seeks to preserve something as private,' and his expectation of privacy is

10

'one that society is prepared to recognize as reasonable,' . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2213 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

¶ 24     "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *see also McKnight*, ¶ 118 (Samour, J., dissenting) ("[T]he home is the most sacred of Fourth Amendment spaces . . . ."). The "curtilage" of the home — the area "immediately surrounding and associated with the home" — is also "part of the home itself for Fourth Amendment purposes." *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *see also People v. Tomaske*, 2019 CO 35, ¶ 9 (same). In the trial court, the People conceded, and the court found, that the area of Tafoya's driveway behind his privacy fence fell within the "curtilage" of his home.

¶ 25     But a person can have no reasonable expectation of privacy in what he or she knowingly exposes to the public. *Katz*, 389 U.S. at 351. So "the fact that a search occurs within the curtilage [of a home] is not dispositive if the area's public accessibility dispels any

11

reasonable expectation of privacy." *People v. Shorty*, 731 P.2d 679, 681 (Colo. 1987).

¶ 26    For example, if a police officer standing on a public sidewalk can see the curtilage of a home, the officer has not conducted a "search" under the Fourth Amendment. As the Supreme Court explained in *California v. Ciraolo*,

> [t]hat the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.

476 U.S. 207, 213 (1986).

¶ 27    Precedent makes clear that a police officer need not remain at ground level to conduct visual observations of the curtilage of a home. In *Ciraolo*, the Supreme Court, in a 5-4 decision, held that it was not a search where a police officer in an airplane at an altitude of 1,000 feet visually observed marijuana plants in a residential backyard enclosed by a privacy fence. *See id.* at 209-15. And in

12

*Florida v. Riley*, a plurality of the Supreme Court held that it was not a search where a police officer in a helicopter at an altitude of 400 feet observed marijuana plants in a nearly enclosed greenhouse in a residential backyard. *See* 488 U.S. 445, 448-55 (1989); *see also Henderson*, 879 P.2d at 389-90 (same).

¶ 28    In *Ciraolo*, the Court explained that a homeowner cannot reasonably expect that activities in his or her enclosed backyard "will not be observed by a passing aircraft — or by a power company repair mechanic on a pole overlooking the yard." 476 U.S. at 214-15. Thus, it would not be a "search" for a police officer to climb a utility pole and look over a privacy fence into a homeowner's backyard.

¶ 29    Nor, in our view, would it be a "search" for a police officer situated on a utility pole to look into a backyard with the aid of a camera with a zoom lens.

¶ 30    In support of this conclusion, we note that divisions of this court have held that a police officer's use of standard binoculars to look at a homeowner's property does not constitute a search. *See People v. Harris*, 2016 COA 159, ¶ 34 n.3 (concluding that it was not a search for officers to use binoculars to look at the defendant's

13

pastures from a neighboring property); *People v. Oynes*, 920 P.2d 880, 882-83 (Colo. App. 1996) (concluding that it was not a search for a police officer to look into a window of a house with binoculars where there was no record evidence that the binoculars were "extraordinarily powerful").

¶ 31   Our review of the surveillance video suggests that the magnification power of the zoom on the pole camera was similar to that of standard binoculars that any civilian can purchase.  Thus, it would not be a search for a police officer to climb a utility pole and look over a privacy fence into a homeowner's backyard with equipment similar to the pole camera.  *See Sundheim v. Bd. of Cty. Comm'rs*, 904 P.2d 1337, 1351 (Colo. App. 1995) (concluding that "the use of a camera with a telescopic lens" did not transform a lawful observation into an unreasonable search), *aff'd*, 926 P.2d 545 (Colo. 1996).

¶ 32   But of course, this case did not involve a police officer physically climbing to the top of a utility pole and looking over Tafoya's privacy fence with a standard pair of binoculars or with a telescopic camera.  It involved the installation of a video camera that allowed police to conduct continuous visual surveillance —

from the police station — of Tafoya's property — including the area behind his privacy fence — for more than three months.

### C.    Does the Continuity and Extended Duration of Video Surveillance Make a Difference to the "Search" Analysis?

¶ 33    Our research indicates that many of the courts to address the issue have concluded that continuous, long-term video surveillance of a private home via a non-trespassory pole camera does not constitute a "search" under the Fourth Amendment. These courts' primary, underlying rationale is that a pole camera only captures events that a police officer or utility worker situated on the pole could see. Significantly, the nature, continuity, and extended duration of police observation from a pole camera are (explicitly or implicitly) considered irrelevant to their "search" analyses. *See Houston*, 813 F.3d at 287-90 (holding that ten-week-long pole camera surveillance was not a Fourth Amendment search, and noting that the police had the same view as "passersby on public roads"); *United States v. Bucci*, 582 F.3d 108, 116-17 (1st Cir. 2009) (same holding regarding eight months of pole camera surveillance of an unfenced property); *United States v. Jackson*, 213 F.3d 1269, 1279-81 (10th Cir.) (same general holding), *cert. granted, judgment*

*vacated, and case remanded on other grounds*, 531 U.S. 1033 (2000); *United States v. Kay*, No. 17-CR-16, 2018 WL 3995902, at *1-3 (E.D. Wis. Aug. 21, 2018) (unpublished opinion) (same holding regarding three months of pole camera surveillance); *United States v. Tuggle*, No. 16-cr-20070-JES-JEH, 2018 WL 3631881, at *3 (C.D. Ill. July 31, 2018) (unpublished opinion) (same holding regarding eighteen months of pole camera surveillance of an unfenced property); *United States v. Mazzara*, No. 16 Cr. 576, 2017 WL 4862793, at *8-12 (S.D.N.Y. Oct. 27, 2017) (unpublished opinion) (same holding regarding twenty-one months of pole camera surveillance); *United States v. Pratt*, No. 16-cr-20677-06, 2017 WL 2403570, at *4-5 (E.D. Mich. June 2, 2017) (unpublished opinion) (same holding regarding fourteen months of pole camera surveillance); *United States v. Brooks*, 911 F. Supp. 2d 836, 841-43 (D. Ariz. 2012) (same holding regarding five months of pole camera surveillance); *State v. Torres*, No. 2 CA-CR 2010-0283, 2011 WL 4825640, at *1-4 (Ariz. Ct. App. Oct. 12, 2011) (unpublished opinion) (same holding regarding three months of pole camera surveillance); *State v. Rigel*, 97 N.E.3d 825, 830-31 (Ohio Ct. App.

16

2017) (same holding regarding 138 days of pole camera

surveillance).

¶ 34     We are not, however, bound by these decisions. *See People v.*

*Dunlap*, 975 P.2d 723, 748 (Colo. 1999) (Colorado courts are "not

bound by a federal circuit court's interpretation of federal

constitutional requirements."); *Wal-Mart Stores, Inc. v. United Food*

*& Commercial Workers Int'l Union*, 2016 COA 72, ¶ 17 (The Colorado

Court of Appeals is "not bound by the decisions of the courts of

other states.").

¶ 35     And unlike the cases noted above, we (like some other courts)

consider the nature, the continuity, and particularly the duration of

pole camera surveillance to be extremely relevant to the issue of

whether police have engaged in a "search." *See United States v.*

*Cuevas-Sanchez*, 821 F.2d 248, 250-51 (5th Cir. 1987) (holding that

two-month-long pole camera surveillance of fenced-in backyard

constituted a search); *United States v. Moore-Bush*, 381 F. Supp. 3d

139, 143-50 (D. Mass. 2019) (same holding regarding eight months

of pole camera surveillance); *United States v. Vargas*, No. CR-13-

6025, 2014 U.S. Dist. LEXIS 184672-EFS, at *13-37 (E.D. Wash.

Dec. 15, 2014) (same holding regarding one month of pole camera

surveillance of mostly enclosed front yard); *Shafer v. City of Boulder*, 896 F. Supp. 2d 915, 929-32 (D. Nev. 2012) (same holding regarding two months of pole camera surveillance of fenced backyard); *State v. Jones*, 903 N.W.2d 101, 106-14 (S.D. 2017) (same holding regarding two months of pole camera surveillance).

¶ 36     "[U]nfettered use of surveillance technology could fundamentally alter the relationship between our government and its citizens[.]" *Jones*, 903 N.W.2d at 112 (citation omitted). "Hidden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement." *United States v. Nerber*, 222 F.3d 597, 603 (9th Cir. 2000). "[A] camera monitoring all of a person's backyard activities . . . provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state." *Cuevas-Sanchez*, 821 F.2d at 251. The question we consider is whether this sort of continuous video surveillance is "'inconsistent with the aims of a free and open society.'" *People v. Oates*, 698 P.2d 811, 816 (Colo. 1985) (quoting Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 348, 403 (1974)).

¶ 37    Although *Jones,* 565 U.S. 400, involved a different type of surveillance, it is instructive.  There, police attached a GPS tracking device to the defendant's car and tracked his location for over four weeks.  *See id.* at 402-03.  The majority opinion held that the use of the GPS tracker constituted a search because of the physical trespass of attaching the tracker to the car.  *See id.* at 402-13.  However, in a concurring opinion, Justice Alito, joined by three other currently sitting justices, warned about the use of technology to monitor civilians' activities for long periods of time.  *See id.* at 418-31.  He wrote:

> In the pre-computer age, the greatest protections of privacy were neither constitutional nor statutory, but practical. Traditional surveillance for any extended period of time was difficult and costly and therefore rarely undertaken. . . .  Devices like the one used in the present case, however, make long-term monitoring relatively easy and cheap. . . .  [T]he use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.

*Id.* at 429-30 (Alito, J., concurring in the judgment).

¶ 38    In a separate concurring opinion, Justice Sotomayor "agree[d] with Justice Alito that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on

expectations of privacy.'" *Id.* at 415 (Sotomayor, J., concurring) (quoting *id.* at 430 (Alito, J., concurring)); *see also id.* at 416 ("Awareness that the Government may be watching chills associational and expressive freedoms.").

¶ 39     In *Carpenter*, 585 U.S. ___, 138 S. Ct. 2206, the United States Supreme Court incorporated the *Jones* concurrences in the course of deciding that the government's acquisition of an individual's cell-site location information (CSLI) from wireless carriers was a "search" under the Fourth Amendment.  The Court, quoting with approval Justice Alito's and Justice Sotomayor's *Jones* concurrences, said that "'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy' — regardless whether those movements were disclosed to the public at large." *Id.* at ___, 138 S. Ct. at 2215 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring); 430 (Alito, J., concurring in the judgment)).  It continued that "[p]rior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken.'" *Id.* at ___, 138 S. Ct. at 2217 (quoting *Jones*, 565 U.S. at 429 (Alito, J., concurring in the

judgment)).  Therefore, the *Carpenter* Court stated that under *Jones*, a search occurs when the government subjects a vehicle to "pervasive tracking" on public roads.  *Id.* at ___, 138 S. Ct. at 2220 (citing *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring), 430 (Alito, J, concurring in the judgment)).

¶ 40    The (or, at least, a) lesson from the *Jones* concurrences and *Carpenter* is that not all governmental conduct escapes being a "search" simply because a citizen's actions were otherwise observable by the public at large.

¶ 41    We acknowledge that, by its own terms, the Court's decision in *Carpenter* "is a narrow one" and does not "call into question conventional surveillance techniques and tools, such as security cameras."  *Id.* at ___, 138 S. Ct. at 2220; *see also Mazzara*, 2017 WL 4862793, at *11 ("The reality is that society has come to accept a significant level of video surveillance.  Security cameras are routinely installed in public parks, restaurants, stores, government buildings, schools, banks, gas stations, elevators, and all manner of public spaces.  Additionally, security cameras are increasingly being installed on public streets, highways, and utility poles.").

¶ 42    A pole camera, however,

>is not a security camera by any stretch of the imagination. . . .  Law enforcement officers did not install the [p]ole [c]amera here to 'guard against . . . crime,' but to investigate suspects. Indeed, the prototypical security camera exists to monitor a heavily trafficked area or commercial establishment.  Security camera operators often install their cameras in plain view or with warning signs to deter wrongdoers.  The Government hid the [p]ole [c]amera out of sight of its targets and does not suggest that it did so to prevent criminal activity.

*Moore-Bush*, 381 F. Supp. 3d at 145-46 (citation omitted).

¶ 43    Several lower federal court decisions upholding the warrantless use of pole cameras have distinguished *Jones* (and would presumably distinguish *Carpenter*) on the ground that GPS or CSLI tracking of a person's location is more invasive than video surveillance of a person's home.  *See, e.g.*, *Houston*, 813 F.3d at 290; *Kay*, 2018 WL 3995902, at *3.  We wholeheartedly disagree. Visual video surveillance spying on what a person is doing in the curtilage of his home behind a privacy fence for months at a time is at least as intrusive as tracking a person's location — a dot on a map — if not more so.  See *United States v. Garcia-Gonzalez*, No. CR 14-10296-LTS, 2015 WL 5145537, at *8 (D. Mass. Sept. 1, 2015)

22

(unpublished opinion) ("GPS data provides only the 'where' and 'how long' of a person's public movements insofar as the person remains close to the monitored vehicle. Long-term around-the-clock monitoring of a residence chronicles and informs the 'who, what, when, why, where from, and how long' of a person's activities and associations unfolding at the threshold adjoining one's private and public lives.").

¶ 44      As the concurring opinion in *Houston* noted, "in most cases, ten weeks of video surveillance of one's house could reveal considerable knowledge of one's comings and goings for professional and religious reasons, not to mention possible receptions of others for these and possibly political purposes." *Houston*, 813 F.3d at 296 (Rose, J., concurring).

¶ 45      Indeed, as the Supreme Court of South Dakota recently explained,

> [t]he information gathered through the use of targeted, long-term video surveillance will necessarily include a mosaic of intimate details of the person's private life and associations. At a minimum, it could reveal who enters and exits the home, the time of their arrival and departure, the license plates of their cars, the activities of the occupant's children and friends entering the home, information gleaned

from items brought into the home revealing where the occupant shops, how garbage is removed, what service providers are contracted, etc.

*Jones*, 903 N.W.2d at 110; *see also Garcia-Gonzalez*, 2015 WL 5145537, at *5 ("The [pole camera] surveillance captured all types of intimate details of life centered on [the defendant's] home. The agents saw when he came and went. They saw his visitors. They saw with whom he traveled. They identified both his frequent and infrequent visitors. They identified the cars each of them drove. They saw how he dressed every day. They saw what he carried in and out of his home, even when he carried out his trash. They knew when he stayed home and when he did not.").

¶ 46     In *Jones*, the South Dakota Supreme Court continued,

[t]he pole camera captured [the defendant's] activities outside his home twenty-four hours a day, sent the recording to a distant location, and allowed the officer to view it at any time and to replay moments in time. . . . [T]his type of surveillance does not grow weary, or blink, or have family, friends, or other duties to draw its attention. Much like the tracking of public movements through GPS monitoring, long-term video surveillance of the home will generate "a wealth of detail about [the home occupant's] familial, political, professional, religious, and sexual associations." The recordings could be stored indefinitely and

> used at will by the State to prosecute a criminal case or investigate an occupant or a visitor.

*Id.* at 112 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)); *see also Moore-Bush*, 381 F. Supp. 3d at 149 ("[T]he Government can go back on a whim and determine a home occupant's routines with to-the-second specificity.").

¶ 47     We are unpersuaded by the People's arguments that the area of Tafoya's driveway behind his privacy fence hypothetically could be seen by a next-door neighbor peering through a small gap in the privacy fence or by the adjacent apartment dweller on a second-story private outdoor stairway (or, for that matter, by someone in a helicopter, or by someone looking through the camera on a drone).

¶ 48     This argument ignores the improbability that a neighbor would peer through a gap in a privacy fence or stand on his or her outdoor stairway for three months at a time. And helicopters and publicly available drones do not remain in flight for three months at a time. Crediting the People's argument would mean there is no temporal cap on how many months or years the police could have continued the video surveillance of Tafoya's property. As the United States

25

Court of Appeals for the District of Columbia has explained in the context of a GPS tracking device,

> the whole of a person's movements over the course of a month is not actually exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil. It is one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work. It is another thing entirely for that stranger to pick up the scent again the next day and the day after that, week in and week out, dogging his prey until he has identified all the places, people, amusements, and chores that make up that person's hitherto private routine.

*United States v. Maynard*, 615 F.3d 544, 560 (D.C. Cir. 2010), *aff'd in part sub nom. Jones*, 565 U.S. 400; *see also Moore-Bush*, 381 F. Supp. 3d at 149 ("[O]n a residential street, neighbors notice each other's peculiar habits. Yet they would not notice all of their neighbors' habits[.]"); *cf. Garcia-Gonzalez*, 2015 WL 5145537, at *3 ("Physical surveillance, in theory, could gather the same information as the pole cameras. However, physical surveillance is difficult to perform. . . . Moreover, here, the officers . . . could not have successfully conducted this surveillance in person. [The

defendant] (and others) likely would have discovered the surveillance.").

¶ 49    It would be all too easy to overlook these issues based on the significant amount of controlled substances that police ultimately found on Tafoya's property.  But as the Supreme Court explained long ago in *United States v. Di Re*,

> a search is not to be made legal by what it turns up.  In law it is good or bad when it starts and does not change character from its success. . . .   [T]he forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment.

332 U.S. 581, 595 (1948) (footnote omitted); *see also Riley*, 488 U.S. at 463-66 (Brennan, J., dissenting) ("[W]e dismiss this as a 'drug case' only at the peril of our own liberties. . . .  The Fourth Amendment demands that we temper our efforts to apprehend criminals with a concern for the impact on our fundamental liberties of the methods we use.").

¶ 50    And as the Supreme Court explained in *Johnson v. United States*,

27

> [c]rime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

333 U.S. 10, 14 (1948).

¶ 51   For these reasons, we conclude that the three-month-long surveillance of the curtilage of Tafoya's home through the pole camera constituted a search under the Fourth Amendment to the United States Constitution.[4]

---

[4] We need not identify with precision the point at which the surveillance became a search, for the line was surely crossed long before the three-month mark. *See Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgment) ("We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark."). We express no opinion here whether we would reach the same conclusion if (1) the duration of the surveillance had been much shorter (say, one or two weeks); or (2) the police had, after such period of time, sought a warrant based on what had been observed or discontinued its warrantless surveillance but later resumed it after a significant interval of time and upon acquiring further information.

¶ 52    Because the fruits of the police surveillance were used to obtain — and were critical to the acquisition of — the warrant to search Tafoya's property, the trial court should (in the absence of an applicable exception to the exclusionary rule) have suppressed the evidence recovered from the search of the property.[5]  And because the evidence recovered from the property — the drugs — was critical to the prosecution's case, its admission into evidence cannot be considered harmless beyond a reasonable doubt.  *See McKnight*, ¶ 60 (determining that an unconstitutional search was not harmless beyond a reasonable doubt where the search uncovered the drug evidence used to convict the defendant). Consequently, Tafoya's convictions must be reversed and the matter remanded for a new trial.

### III.    *Proceedings on Remand*

¶ 53    The People argue that, in the event we conclude that the pole camera surveillance constituted a search, on remand the trial court

---

[5] The People assert that the application of the good faith exception to the exclusionary rule would have supported the admission of the evidence at trial.  But because the prosecution did not raise this assertion in the trial court, we need not consider it.  *See People v. McKnight*, 2019 CO 36, ¶ 61.

should be allowed to consider whether the suppression motion should be denied on some other ground (for example, that the exclusionary rule should not apply). Tafoya disagrees, emphasizing that the People did not raise any such argument in the trial court.

¶ 54    During the pendency of this appeal, the supreme court issued its decision in *People v. Morehead*, 2019 CO 48. That binding precedent makes clear that it is not our place to direct the trial court whether to exercise its discretion on remand to consider any new arguments that the People might make in opposition to the suppression motion.

## IV.    Conclusion

¶ 55    The judgment of conviction is reversed, and the case is remanded for a new trial.

JUDGE RICHMAN and JUDGE BROWN concur.